[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Lucas Cty. Republican Party Executive Commt. v. Husted,* Slip Opinion No. 2015-Ohio-3948.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2015-OHIO-3948

THE STATE EX REL. LUCAS COUNTY REPUBLICAN PARTY EXECUTIVE COMMITTEE *v.* HUSTED.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Lucas Cty. Republican Party Executive Commt. v. Husted,* Slip Opinion No. 2015-Ohio-3948.]**

*Mandamus—County boards of elections—R.C. 3501.07—Replacement of ousted board members—Secretary of state—Political party's recommendation of candidates for seats on board rejected by secretary of state—Reasons for rejection must be in writing—Secretary's basis for rejecting candidate must be based on reasonable belief that candidate is incompetent to serve—Secretary's decision will not be disturbed absent abuse of discretion—Writ denied.*

(No. 2014-1123—Submitted May 19, 2015—Decided October 1, 2015.)

IN MANDAMUS.

_____

**Per Curiam.**

{¶ 1} Relator, the Lucas County Republican Party Executive Committee ("LCRP"), seeks a writ of mandamus compelling respondent, Ohio Secretary of State Jon Husted, to appoint Kelly Bensman and Benjamin Roberts to seats on the Lucas County Board of Elections. We deny the writ.

*Background*

*The history of trouble at the Lucas County Board of Elections*

{¶ 2} On December 9, 2011, Ben Roberts resigned as director of the Lucas County Board of Elections after five months on the job. In his resignation letter, Roberts described the board as "a caustic environment" and alleged e-mail fraud, document destruction, and a lack of policies and procedures. Roberts wrote that he was resigning because "it has been made nearly impossible for me to make a difference" at the board.

{¶ 3} Meanwhile, a Democrat on the elections board, James Ruvolo, told the Toledo Blade that "[e]ver since I got on the board, it has been obvious there are certain members of the board who create chaos and enjoy it." Messina, *Elections Director Resigns Post,* Toledo Blade (Dec. 9, 2011). Ruvolo clarified that he was referring specifically to Republican board member Jon Stainbrook. A reporter for the Toledo Free Press, writing two months later, stated that board meetings "typically escalate to heated altercations and eye-rolling among board members and sighs or hushed laughter from the public attending." McGlade, *BOE Yet to Investigate Questionable Office Hours,* Toledo Free Press (Feb. 19, 2012), A8.

{¶ 4} On August 13, 2012, Secretary of State Husted placed the Lucas County Board of Elections under "administrative oversight" after the board missed a deadline to produce a bipartisan organizational chart with position descriptions. This was the second time in 17 months that Husted had placed the Lucas County board under administrative oversight; the first such period ran from

March to October 2011. As part of the second oversight, Husted relieved the director and deputy director of their responsibilities and appointed two special masters to conduct the daily operations of the board. In addition, Husted appointed two "bipartisan election administration consultants" to prepare a report on long-term solutions for the board.

{¶ 5} The report, prepared by former board member Ruvolo and former Assistant Secretary of State Jonathan A. Allison, was a harsh indictment of the board. The Allison/Ruvolo report concluded that "the Lucas County Board of Elections as presently situated is devoid of management leadership, is without most of the basic organizational structure, policies and procedures necessary to function as an accountable government entity, and is culturally plagued by mistrust and fear." The report continued:

It is difficult to describe in words the pervasive, underlying cultural problems at the Board. While we have earlier alluded to a genuine lack of trust, it is safe to say that mistrust and paranoia are pervasive at seemingly every level of the Board. Furthermore, an unhealthy, aggressive (both overt and passive) lack of trust and disdain exists between the director and deputy director. * * *

* * * Our interviews revealed instances where Board members openly demonstrated a rude, uncivil and unprofessional tone toward fellow Board members and toward Board employees.

The report recommended that the board remove both the director and the deputy director. Board member John Irish made a motion to adopt the Allison/Ruvolo report in its entirety, but the motion died for want of a second.

*The transparency committee*

**{¶ 6}** On April 2, 2014, Husted notified the board that he had appointed former Secretary of State Jennifer Brunner and former Assistant Secretary of State Scott Borgemenke as his representatives to assess the current state of the board's operations, policies, and procedures.

**{¶ 7}** Five days later, Husted issued Directive 2014-11 creating a four-member "transparency committee," consisting of Borgemenke, Brunner, Allison, and Ruvolo. The directive instructed the board to call a special meeting for April 9, 2014, and then turn the meeting over to the transparency committee, so it could inquire broadly about "individual-level and agency-wide policies, procedures and operations."

**{¶ 8}** At the first transparency-committee session, director Gina Kaczala, deputy director Dan DeAngelis, and the four board members (Ron Rothenbuhler, Stainbrook, Tony DeGidio, and Irish) testified for six hours. They described an organization in disarray, plagued by discord, and lacking basic employee policies and procedures as well as a working system for placing discussion items on its meeting agenda. In fact, the board members conceded that they routinely convened special meetings (i.e., executive sessions, at which, by law, the agenda would be restricted) and very rarely held regular meetings with open agendas.

**{¶ 9}** Of greater concern, board members and staff admitted that the board had not reviewed or voted to refer mandatory campaign-finance audit reports to the Ohio Elections Commission in over two years. Moreover, the deputy director testified that someone had tampered with the board's list of volunteer poll workers, but that he had neither investigated the matter nor informed the board of his concerns.

**{¶ 10}** The witnesses also alleged that the board staff failed to post a list of approved candidates until after the deadline for filing candidacy protests had passed, employees and board members secretly tape-recorded one another,

someone improperly wiped a computer hard drive, Stainbrook routinely berated and insulted other board members, and an employee had filed a criminal complaint against Stainbrook for assault.

{¶ 11} The second session of the committee occurred six days later, on April 15, 2014. Witnesses, including board employees, revisited issues such as the lack of policies for handling campaign-finance reports and board-meeting agenda items, as well as the accusations of harassment and threats. In addition, the committee heard about security lapses at the board offices and an allegation that the board allowed voters to cast ballots on untested voting machines (an allegation that another witness disputed).

{¶ 12} The third session, on April 23, 2014, featured allegations that Stainbrook sent a text message to employees at the board's warehouse division instructing them to "work [as] slowly as possible and do not report any errors," in order to sabotage the upcoming election; that board staffers falsified information on the opposing party's poll-worker database; and that a board employee was arrested for getting high on bath salts and biting part of a woman's hand off.

{¶ 13} Robert Walden Jr., the board's IT manager for GEMS,[1] testified that on election night in November 2013, he was working on the computer server in a roped-off area to tabulate results. However, a group of people near the rope line were distracting him. A woman he later realized was Kelly Bensman was using her cell phone apparently to take pictures, which, along with the boisterous conversation, Walden found very disruptive. So Walden said to Bensman and the others, "[C]an we just do this later," which provoked Stainbrook to jump up and come running at Walden. And as this was going on, Walden stated, Bensman was

---

[1] GEMS is the computer software responsible for ballot layout and tabulation.

"calling [him] all kinds of names, how the whole election is screwed up because of [him], blah, blah, blah."

{¶ 14} The fourth and final commission session occurred on May 9, 2014, after the primary election. By all accounts, election night was chaos at the board of elections.

{¶ 15} Stainbrook was involved in two separate incidents that evening. The first was an argument he and former board director Meghan Gallagher had with Kaczala over who had the authority to administer oaths to election observers. Kaczala testified that, as Gallagher and Stainbrook were confronting her, Bensman, who was one of the observers waiting to take her oath, joined in by hurling insults at Kaczala and making fun of her makeup and appearance.

{¶ 16} Later that evening, as the tabulation process dragged on, a second shouting match erupted. The issue, according to Stainbrook, was that five voting-machine data cards were missing. Whatever the impetus, Kaczala said, "Mr. Stainbrook began to yell at me and he called me a liar * * *. [I]t all went chaotic because Jon was just screaming at me."

{¶ 17} At the close of the May 9, 2014 meeting, the committee publicly recommended the removal of Stainbrook, DeGidio, and Rothenbuhler from the board. In addition, the committee recommended the termination of Kaczala and DeAngelis.

{¶ 18} Husted then appointed his director of elections, Matt Damschroder, as a hearing officer to allow the officials an opportunity to explain why they should not be removed from office. DeAngelis voluntarily resigned. The others attended a seven-hour session on May 15, 2014, at which they had the opportunity to defend themselves from accusations recited by the members of the transparency committee.

{¶ 19} On June 4, 2014, Damschroder issued a report recommending that the secretary remove Director Kaczala and the three board members. The next

day, Husted removed Stainbrook, DiGidio, and Rothenbuhler from their positions and suspended Irish until new board members were sworn in. However, he allowed Kaczala to stay on as interim director.

*The rejection of Bensman and Roberts*

{¶ 20} A county board of elections consists of four members, appointed by the secretary of state. R.C. 3501.06(A). Seats are apportioned between the two major political parties. R.C. 3501.06(B). Appointments for new terms, or to fill vacancies for unexpired terms, are made from the political party to which the outgoing or vacating member belonged. R.C. 3501.06(C). When a vacancy occurs, the executive committee of the political party entitled to the appointment may recommend a qualified elector for the seat. R.C. 3501.07. The secretary shall appoint the recommended elector unless the secretary "has reason to believe that the elector would not be a competent member of such board." *Id.*

{¶ 21} Husted's decision to remove most of the board left the Republican Party with two spaces to fill. LCRP selected Bensman to complete the unexpired board term ending February 29, 2016, and Roberts for the unexpired term ending February 28, 2017. The executive committee formally recommended Bensman and Roberts for appointment by letter dated June 18, 2014, signed by party chairman Jon Stainbrook.

{¶ 22} Husted rejected the recommendations by letter dated June 24, 2014. R.C. 3501.07 requires the secretary to provide written reasons for rejecting a recommendation. *State ex rel. Lawrence Cty. Republican Party Executive Commt. v. Brunner*, 119 Ohio St.3d 92, 2008-Ohio-3753, 892 N.E.2d 428, ¶ 8. With respect to Bensman, Husted offered the following explanation:

> While Kelly Bensman is not currently and has not been an employee of the board for some time, it is clear to me that she is not only involved, but is a central figure in creating an

environment of dysfunction and distrust at the Lucas County Board of Elections.

On more than one occasion Ms. Bensman has been a primary figure in an altercation or incident at the Lucas County Board of Elections. Over the course of four meetings of the transparency committee, Ms. Bensman was frequently cited by board members and staff as being a source of intimidation and provocation that would at times escalate to claims of both verbal and physical altercations both by and towards Ms. Bensman, with one of those altercations leading to her removal from the Government Center.

As recently as the May Primary Election, Ms. Bensman was alleged to have taunted, yelled [at], and intimidated board employees. *The Toledo Blade* went so far as to describe Ms. Bensman as "stalking * * * like prey" board staff on Election Night.

The facts in this matter are clear, Ms. Bensman was and remains part of the dysfunction at the Lucas County Board of Elections.

(Ellipsis sic.) In the same letter, Husted wrote the following about Roberts:

Mr. Benjamin Roberts served as the Director of the Lucas County Board of Elections for approximately five months in 2011. The culture that perpetuated [sic] under his leadership, his inability to manage or change what he himself upon his resignation deemed a "caustic environment" make him incompetent to serve on the Lucas County Board of Elections.

At the start of Mr. Roberts' tenure, the board of elections was under oversight by my office. In October of 2011, I determined that despite active engagement there was nothing more my office could provide at that time and it was time for local leadership "to assume complete and total responsibility for the oversight of operations and the duties assigned to them."

Just two months after being tasked with fulfilling his duties, Mr. Roberts relinquished his position and in his letter of resignation said he was unable to make a difference. By his own admission he was not the change agent the Board required then, and he cannot be now.

During Mr. Roberts' incomplete term of office, accusations among staff of impropriety such as possible email hacking and misuse of time, an absence of policies and procedures and partisan division proliferated. Further, as Director, he presided over confusion surrounding a final vote tally and instructed the cancellation of poll worker training in advance of an election.

{¶ 23} In summary, Husted wrote, "[d]ue to the myriad of issues linked to both Ms. Bensman and Mr. Roberts, I find that neither have the requisite or adequate ability or qualities required to be competent members of the Lucas County Board of Elections." Citing R.C. 3501.07, he rejected both recommendations.

{¶ 24} If the secretary rejects a recommendation, the Revised Code gives the executive committee a choice of remedies: the committee "may either recommend another elector or may apply for a writ of mandamus to the supreme court to compel the secretary of state to appoint the elector so recommended." R.C. 3501.07. An executive committee may not pursue both alternatives. *State*

*ex rel. Pike Cty. Republican Executive Commt. v. Brown*, 43 Ohio St.3d 184, 185, 540 N.E.2d 245 (1989).

**{¶ 25}** The executive committee elected to seek a writ of mandamus. The parties submitted briefs, evidence, and a stipulation of facts.

*Legal framework*

**{¶ 26}** R.C. 3501.07 expressly places the burden of proof on the committee in a mandamus action "to show the qualifications of the person so recommended." The secretary has discretion to determine the competence of a recommended candidate, and this court will interfere with the secretary's rejection of a recommendation only to correct an abuse of discretion. *State ex rel. Lawrence Cty. Republican Party,* 119 Ohio St.3d 92, 2008-Ohio-3753, 892 N.E.2d 428, ¶ 13.

**{¶ 27}** "Competence" to serve involves qualities beyond intelligence and integrity. It also includes the basic ability to get along with co-workers and inspire confidence in the election system. *State ex rel. Lucas Cty. Democratic Executive Commt. v. Brown,* 39 Ohio St.3d 157, 162-163, 314 N.E.2d 376 (1974). R.C. 3501.07 requires a *reasonable* belief that a person is incompetent to serve on the elections board. *State ex rel. Summit Cty. Republican Executive Commt. v. Brunner*, 118 Ohio St.3d 515, 2008-Ohio-2824, 890 N.E.2d 888, ¶ 78 (Cupp, J., concurring). It is an abuse of discretion for the secretary to reject a recommendation based on rumors and suspicion. *State ex rel. Cuyahoga Cty. Democratic Party Executive Commt. v. Taft*, 67 Ohio St.3d 1, 2, 615 N.E.2d 615 (1993).

*Kelly Bensman*

**{¶ 28}** LCRP submitted evidence of Bensman's qualifications, including five affidavits lauding her intelligence, honesty, and respectfulness. Her professional experience includes full-time employment as a hydrogeologist with an engineering consulting firm. In 2013, Governor John Kasich appointed her to

10

the Ohio Department of Natural Resources Ohio Water Advisory Council. LCRP describes her as a "politically active" Republican who is "generally familiar" with the operations of the Lucas County Board of Elections.

{¶ 29} Husted's rejection letter called Bensman "a central figure in creating an environment of dysfunction and distrust" at the board. The record supports this characterization.

{¶ 30} Witnesses at the transparency-committee hearings implicated Bensman in multiple disruptive episodes at the board. Gina Kaczala described how, as she was trying to swear in the election observers, Bensman "became involved and started making personal insults to me," mocking her makeup and appearance.[2] Robert Walden testified that Bensman was behaving "provocatively" and causing "way too much confusion."

{¶ 31} Kaczala also testified that Bensman interfered with her attempts to speak privately with her deputy by following "2 inches behind me" and refusing to allow them to speak in private. The Toledo Blade described Bensman and others following Kaczala "like sharks stalking prey." Messina, *Lucas County Elections Board Plagued by Problems,* Toledo Blade (May 7, 2014). Kaczala cited Bensman as one of the people refusing to stay in the area marked off for observers, intruding into the workspace reserved for GEMS manager Walden, and distracting the GEMS staff throughout the evening by crowding around them and asking questions.

{¶ 32} The Toledo Blade also reported that in March 2013, Bensman became so disruptive during a board meeting that board member DeGidio asked security to remove her from the building. The article quoted Bensman as saying that the situation was quickly defused, and she was allowed to stay. Bensman's

---

[2] Husted's merit brief erroneously states that "Ms. Bensman would not allow Ms. Kaczala to properly swear her in as an observer * * *." This is inaccurate. It was Meghan Gallagher who refused to be sworn in by Kaczala.

assertion in her affidavit that "I have never been removed from Lucas County Government Center for any reason" is consistent with this account but does not contradict the evidence that she was disruptive during the meeting.

{¶ 33} The record also contains evidence of public complaints about Bensman. Dennis C. Lange wrote a letter recounting how Bensman had once threatened his employment with the board of elections.

> On June 14th, 2008, at the 2008 re-organizational [sic] of the Lucas County Republican Central Committee meeting held at Angola Gardens banquet hall I was leaving the meeting and a male with a video camera approached me with Kelly Bensman. She said, "Yea get him, he's one of those state workers from the Board of Elections." I turned and corrected her; I stated, "I work for the *County* Board of Elections." She then said, "It won't be for long, we are going to fire you and the rest of the Republicans."

(Underlining sic.)

{¶ 34} And on July 3, 2012, board employee Tim Ide sent an e-mail message to the board of elections in which he complained about Stainbrook, Gallagher, and Bensman accosting him at home one night.

> On April 24th 2012 Jon Stainbrook, Meghan Gallagher, and Kelly Bensman came to my house at 11:00 PM and proceeded to yell at and berate me for not "being a real [R]epublican" for "not being on our team" that "I can't be trusted" that "You didn't even vote in the Primary" etc., etc., this abuse went on until 12:30 AM, when I finally told the three of them that I am done listening to their abuse and that I am cold and going inside. All of this 1.5

12

hour confrontation took place on the front porch of my house, since they refused to come inside.

**{¶ 35}** The evidence amply supports Husted's conclusion that Bensman lacked the competence to serve on the board. Appointing a board member with her long history of disruptive and confrontational behavior, who was repeatedly described as engaging in intimidating tactics and abusive language with board members and staff, would ill-serve Husted's goal of restoring public confidence in the Lucas County Board of Elections.

**{¶ 36}** We hold that Husted did not abuse his discretion, and therefore LCRP is not entitled to a writ of mandamus to compel the appointment of Kelly Bensman.

*Ben Roberts*

**{¶ 37}** LCRP submitted affirmative evidence of Roberts's qualifications. Roberts has worked for 15 years as an executive at a management consulting company, specializing in nonprofit, education, and medical practices. He served as director of the Lucas County Board of Elections for five months, from July to December 2011. His experience also includes three years as a director at the West Side Montessori in Toledo and service as a volunteer and member of several boards. LCRP also submitted affidavits from four members of the public praising Roberts's intelligence, honesty, and competence.

**{¶ 38}** Husted's letter described Roberts as "incompetent to serve" primarily because Roberts was unable to change the caustic board environment during his tenure as director. In his deposition, Husted explained that Roberts, in his resignation letter, had indicated that he was "not up to the job" of changing the culture of the board, and this admission was the "primary factor" in the decision not to appoint Roberts to the board.

{¶ 39} Husted is correct about the basic facts: Roberts *did* resign as director after a short time because, by his own admission, he could not change the board's dysfunctional culture. Husted, as the official charged with executing the statute, has interpreted the word "competence" to include an ability to change the culture of the board. Because that is a reasonable reading of the statutory language, we must defer to the secretary's interpretation. *State ex rel. Skaggs v. Brunner*, 120 Ohio St.3d 506, 2008-Ohio-6333, 900 N.E.2d 982, ¶ 56. We therefore hold that Husted did not abuse his discretion and that LCRP is not entitled to a writ of mandamus to compel the appointment of Ben Roberts.

*Conclusion*

{¶ 40} For the foregoing reason, we deny the application for a writ of mandamus.

Writ denied.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, and O'NEILL, JJ., concur.

LANZINGER, KENNEDY, and FRENCH, JJ., not participating.

_____

The Law Offices of William M. Todd, Ltd., and William M. Todd, for relator.

Michael DeWine, Attorney General, and Tiffany L. Carwile and Ryan L. Richardson, Assistant Attorneys General, for respondent.

_____