[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Summit Cty. Republican Party Executive Commt. v. LaRose*, Slip Opinion No. 2021-Ohio-1464.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2021-OHIO-1464

THE STATE EX REL. SUMMIT COUNTY REPUBLICAN PARTY EXECUTIVE COMMITTEE *v*. LAROSE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Summit Cty. Republican Party Executive Commt. v. LaRose*, Slip Opinion No. 2021-Ohio-1464.]

*Elections—Mandamus—Writ of mandamus sought to compel secretary of state to appoint county political party's recommended qualified elector to the county board of elections—R.C. 3501.07—Secretary of state abused his discretion in rejecting party's recommendation—Writ granted.*

(No. 2021-0327—Submitted April 21, 2021—Decided April 27, 2021.)

IN MANDAMUS.

_____

**Per Curiam.**

{¶ 1} In this expedited election case, relator, the Summit County Republican Party Executive Committee, seeks a writ of mandamus compelling

respondent, Secretary of State Frank LaRose, to reappoint Bryan C. Williams to the Summit County Board of Elections.  We grant the writ.

## I. BACKGROUND

{¶ 2} Williams is the current chair of the committee.  In January 2021, the committee submitted a recommendation to Secretary LaRose to reappoint Williams, who had already served two terms as a member of the board, for a third term, to run from March 1, 2021, through February 28, 2025.

{¶ 3} LaRose rejected the appointment in a letter dated March 3, 2021.  In his letter, he did not criticize Williams's personal qualifications or conduct; rather, he expressed concerns about the overall performance of the board, for which he believed Williams and the other board members should bear ultimate responsibility. Specifically, LaRose listed seven problems at the board as the basis for his decision to reject the recommendation: (1) he had received complaints of a hostile and unprofessional workplace at the board, (2) the board failed to distribute its antidiscrimination and anti-harassment policy to employees and had not updated the policy since 2004, (3) the board failed to properly update its voter rolls by removing the names of deceased electors, leading to at least one documented instance of voter fraud, (4) the board may have improperly canceled the registration of certain felons who were qualified electors, (5) the board failed to maintain bipartisan control of election administration, (6) the board failed to cross-train employees on election-administration tasks and to ensure continuity of operations during staff turnover, and (7) the board failed to adequately manage and control traffic issues during the early-voting period for the November 2020 general election.

{¶ 4} Also, on March 3, LaRose placed the board on administrative oversight, citing the same seven concerns.

{¶ 5} On March 12, 2021, the committee filed its complaint for a writ of mandamus to compel LaRose to reappoint Williams to the board.  As a legal matter,

the committee questions whether the secretary has the discretion to reject a recommendation for reasons unrelated to that person's personal misconduct. And as a factual matter, the committee disputes the validity of LaRose's reasoning in the rejection letter.

{¶ 6} We extended the briefing schedule of this expedited matter to permit the committee to depose LaRose and Amanda Grandjean, the director of elections with the secretary of state's office. ___ Ohio St.3d ___, 2021-Ohio-909, ___ N.E.3d ___. The case is fully briefed.

## II. ANALYSIS

*A. Mandamus actions challenging the secretary of state's rejection of a committee's recommendation of an appointee to a board of elections*

{¶ 7} A county board of elections consists of four members—two members from each of the two major political parties. R.C. 3501.06(A) and (B). Although all members must be appointed by the secretary of state, the county executive committee of the appropriate political party typically recommends a qualified elector to fill any vacancy. R.C. 3501.05(A), 3501.07. The secretary must appoint the recommended elector unless the secretary "has reason to believe that the elector would not be a competent member" of the board. *Id.*

{¶ 8} When the secretary of state refuses to appoint an elector recommended by a county executive committee, the committee may file an action for a writ of mandamus in this court to compel the appointment. *Id.* In the mandamus action, "the burden of proof to show the qualifications of the person so recommended shall be on the committee making the recommendation." *Id.* As in any mandamus case, in order to prevail, the committee in this case must establish, by clear and convincing evidence, a clear legal right to have Williams appointed to the board and a clear duty on the part of LaRose to do so. *State ex rel. Waters v. Spaeth*, 131 Ohio St.3d 55, 2012-Ohio-69, 960 N.E.2d 452, ¶ 6. Because R.C. 3501.07 expressly authorizes mandamus as a remedy, the committee is not required

to demonstrate that it lacks an adequate remedy in the ordinary course of the law. *See State ex rel. Steckman v. Jackson*, 70 Ohio St.3d 420, 426-427, 639 N.E.2d 83 (1994), *overruled on other grounds*, *State ex rel. Caster v. Columbus*, 151 Ohio St.3d 425, 2016-Ohio-8394, 89 N.E.3d 598.

{¶ 9} To meet that standard, the committee must show that LaRose abused his discretion. *State ex rel. Democratic Executive Commt. of Lucas Cty. v. Brown*, 39 Ohio St.2d 157, 161, 314 N.E.2d 376 (1974). R.C. 3501.07 gives the secretary of state "broad discretion in determining whether recommended appointees are competent to be members of boards of elections." *Id.* at 160. Therefore, to successfully challenge LaRose's assessment of Williams's fitness, the committee must show that LaRose's rejection of Williams's appointment was an abuse of discretion. *Id.* at 161.

*B. Williams's qualifications*

{¶ 10} From 1997 through 2004, Williams served as a state representative in the Ohio General Assembly. During that time, he served as vice-chair of the Ethics and Elections Committee.

{¶ 11} In February 2004, he assumed the position of director of the Summit County Board of Elections. He remained in that position for four years and then served as deputy director for two years. Beginning in March 2014, he served two terms as a member of the board. His second term expired at the end of February 2021.

{¶ 12} In 2007, the secretary of state appointed Williams to serve on a task force known as Project EVEREST, which conducted a comprehensive study of electronic voting systems in Ohio. Project EVEREST led to more widespread use of optical-scan paper ballots for voting in Ohio.

{¶ 13} In March 2021, Governor DeWine appointed Williams to the University of Akron Board of Trustees. He has also been a member of the state board of education and court administrator for the Summit County Juvenile Court.

*C. The scope of LaRose's discretion*

{¶ 14} LaRose concedes in his deposition that he has "no specific knowledge" of any misconduct by Williams during his tenure as director and deputy director of the board. And he has no knowledge of Williams personally engaging in workplace hostility or harassment or unprofessional conduct. Rather, LaRose "made the decision that none of the incumbent Board members should be reappointed because this Board needs cultural change."[1] LaRose perceived a culture of "dysfunction" at the board, based on the seven reasons he mentioned in his letter, for which he felt Williams had to assume responsibility.

{¶ 15} The predicate legal question in this litigation is whether LaRose may reject a recommendation for reasons unrelated to personal misconduct by the recommended appointee. The committee contends that it has the right to select its own board representatives, subject only to a limited right of the secretary of state to reject a candidate who lacks the competence or qualifications to serve. And in this context, the committee contends, a determination of incompetence requires "individualized evidence that an incumbent board member or proposed board member engaged in *personal* misconduct or *personal* misbehavior." (Emphasis sic.)

{¶ 16} The committee is correct that the court's appointment cases typically involve disqualifying conduct by the specific person under consideration. Most recently, for example, the secretary of state rejected a prospective appointee who used an official county e-mail address for partisan political activities. *State ex rel. Lorain Cty. Democratic Party Executive Commt. v. LaRose*, ___ Ohio St.3d ___, 2021-Ohio-1144, ___ N.E.3d ___, ¶ 8, 18-19. And in *Brown*, 39 Ohio St.2d 157, 314 N.E.2d 376, the secretary of state rejected a prospective appointee whose

---

1. LaRose testified that he had decided not to reappoint either of the incumbent members of the board. However, the other incumbent member, a Democrat, whose term on the board expired in 2021, chose not to seek reappointment.

misbehavior included " 'attempt[ing] to by-pass the board [of elections] to undertake actions of dubious legality' " and " 'inject[ing] abrasive partisan bickering into the conduct of board business.' " *Id*. at 162, quoting the secretary's letter explaining his reasoning. However, we have not held that personal misconduct is the *only* measure of incompetence to serve.

{¶ 17} In support of a broader discretion to reject recommended appointees, LaRose cites *State ex rel. Lucas Cty. Republican Party Executive Commt. v. Husted*, 144 Ohio St.3d 352, 2015-Ohio-3948, 43 N.E.3d 411. In *Husted*, the secretary of state rejected two appointees to the Lucas County board of elections. The first appointee was deemed incompetent for typical reasons of misbehavior: she had a "long history of disruptive and confrontational behavior [and] was repeatedly described as engaging in intimidating tactics and abusive language with board members and staff." *Id*. at ¶ 35. The secretary rejected the second recommendation, however, under a less traditional theory: we noted that the secretary had described that appointee as " 'incompetent to serve' primarily because [the appointee] was unable to change the caustic environment [at the board of elections] during his tenure as director." *Id*. at ¶ 38, quoting the secretary's letter explaining his reasoning. The secretary did not accuse the appointee of personally engaging in caustic or unprofessional behavior. Nevertheless, this court declined to issue a writ of mandamus. The secretary had interpreted the notion of competence to serve on the board, *see* R.C. 3501.07, to include the ability to improve a poor work environment. We deferred to the secretary's interpretation. *Id*. at ¶ 39. Our independent assessment of the term "competent" in R.C. 3501.07 supports that interpretation.

{¶ 18} "Competent" means "having requisite or adequate ability or qualities." *Merriam-Webster's Collegiate Dictionary* 253 (11th Ed.2003). Competence to serve "involves qualities beyond intelligence and integrity [such as] the basic ability to get along with co-workers and inspire confidence in the election

system." *Husted* at ¶ 27. We agree with LaRose that the best measure of Williams's competence to serve on the board of elections is the quality of his prior performance on that very same board, and we would include his tenure as director and deputy director. The question, however, is whether the evidence supports LaRose's assertion that Williams's acts or omissions as a board member caused or contributed to problems at the board. And on that score, we conclude that the evidence does not support LaRose's assertion of deficient performance.

*D. LaRose's reasons not to reappoint Williams*

**1. The first reason: a toxic work environment**

{¶ 19} The first item in LaRose's rejection letter read:

> 1. In recent months, my Office received complaints regarding hostility in the workplace, unprofessionalism, and a politically charged environment. The complaints describe a pattern of political quid pro quo spanning many years.

{¶ 20} On December 8, 2020, Grandjean received an anonymous letter alleging that there were problems at the board. The unknown author wrote:

Untitled

> Director Grandjean,
>
> I'm writing you under the anonymous reporting provision of the Ohio Secretary of State's Ethics policy to outline disconcerting circumstances going on at the Summit County Board of Elections.
>
> For years the Board has been a hostile workplace environment. Employees are regularly demeaned by superiors. There is a culture of fear. Jobs are handed out to people based on

loyalty to the county parties and how much they can fundraise by selling tickets to fundraisers—not through merit or qualifications.

Politics happens on county time regularly. Races are discussed, volunteers are recruited for party functions, anyone that doesn't deliver politically can expect to find themselves without a job. One need only look at a given party's campaign finance reports to see contributions from the Board employees. These are hardly voluntary.

One board member even hired his daughter to work at the board, something I believe is in violation of the Elections Officials Manual.

I hope you'll take these concerns into consideration. I hope you'll share them with the appropriate law enforcement and regulatory bodies, especially the Ohio Ethics Commission.

{¶ 21} On January 13, 2021, Grandjean wrote to the board informing it of the anonymous complaint and instructing the board to investigate the allegations. Lance Reed, director of the board, responded to Grandjean's letter. With respect to the allegations of unprofessionalism, hostility, and political activity on state time, Reed wrote that he and the deputy director were unaware of any such problems and that the board's human-resources department had not received any complaints. Reed denied the allegations that had been made in the letter, expressly refuting the nepotism allegation by pointing out that board members play no role in hiring seasonal and part-time staff and that full-time staff—which are hired by the board during public meetings—does not include any family member of any board member.

{¶ 22} In his deposition, LaRose asserted that based upon briefings from his staff members, "my judgment of the situation is that there's reason to believe that

these complaints are warranted and serious." But the record lacks any evidence to substantiate the allegations. Neither he nor Grandjean cites any evidence that independently verifies the allegations or refutes the committee's evidence that the allegations are unfounded. LaRose does not know who wrote the letter. And yet the entire basis for the first reason given by LaRose to reject Williams's appointment is that single anonymous letter.

{¶ 23} R.C. 3501.07 requires a *reasonable* belief that a person is incompetent to serve on the elections board. *Husted*, 144 Ohio St.3d 352, 2015-Ohio-3948, 43 N.E.3d 411, at ¶ 27. For this reason, it is an abuse of discretion for a secretary of state to reject a recommendation based on rumors or suspicion. *Id*. An accusation without proof, anonymous or not, is not a reasonable nor reliable basis for rejecting a county executive committee's recommendation.

{¶ 24} Grandjean attests that the secretary of state received additional complaints *after* placing the board on administrative oversight (that is, after the secretary had already rejected Williams's appointment). Affidavits from two former board employees who lodged complaints are in the record. Namely, Karen Considine's affidavit includes an attached letter that she wrote to board members in April 2016 complaining about a specific board employee who was (according to Considine) rude to coworkers and the public. And Cecilia Robart's affidavit offers a laundry list of complaints, some that mirror the allegations in the anonymous letter and others that do not. Robart's affidavit alleges "severe partisanship among management," employees not working while on county time, a failure to train and cross-train employees, and managers disrespecting and insulting subordinates.

{¶ 25} There are two problems with Considine's and Robart's affidavits. First, R.C. 3501.07 requires the secretary of state, when rejecting a committee's recommendation for the board of elections, to set forth in writing "the reasons therefor." It logically follows that the secretary cannot defend an ensuing mandamus

action by relying on after-acquired evidence that did not help form the basis of the decision to reject the county party's nomination.

**{¶ 26}** Second, even with the benefit of Considine's and Robart's affidavits, LaRose's concerns about a dysfunctional board culture remain the product of rumors and suspicions. Considine's affidavit features a five-year-old complaint about one particular board employee. Robart's accusations are serious, but LaRose does not claim to have investigated and confirmed her claims.

**{¶ 27}** In *State ex rel. Cuyahoga Cty. Democratic Party Executive Commt. v. Taft*, 67 Ohio St.3d 1, 615 N.E.2d 615 (1993), we held that "when the Secretary of State rejects a recommended appointee for failure to comply with the campaign finance laws, suspected violations of these requirements will not, standing alone, justify the conclusion that the appointee is incompetent to serve." *Id*. at 2. In that case, the secretary acted on the basis of a newspaper article detailing the allegations and on his own review of the financial disclosures. Here, LaRose unreasonably relied on an even weaker indicator of incompetence, an anonymous complaint that was much less probative.

**{¶ 28}** We hold that LaRose abused his discretion to the extent that he rejected Williams's appointment based on the first reason in his letter.

### 2. The second reason: failure to disseminate and update an antidiscrimination and anti-harassment policy

**{¶ 29}** Next, LaRose wrote that he was rejecting Williams's appointment because:

> 2. According to the Board's February 4, 2021 letter, the Board adopted an anti-discrimination/anti-harassment policy in 2004 but failed to train the staff on, or even distribute the policy to, staff. If a policy is not communicated to staff, it has no effect. Moreover, the Board failed to reevaluate or update that policy in 17

10

years. All employees deserve to work in a professional environment, and failure to update and regularly disseminate appropriate policies is a fundamental breakdown in basic human resource management.

{¶ 30} On January 21, 2021, Grandjean wrote to the board to express concerns regarding the administration of the November 2020 general election. This was followed by a series of letters between Grandjean and Reed, the director of the board. In one such letter, dated February 4, 2021, Reed wrote that the board had adopted an anti-discrimination and anti-harassment policy in 2004 but that an investigation revealed that the policy had never been provided to board employees. In addition, Reed stated that the board had not adopted procedures for employees to report suspected ethics violations. LaRose in his deposition characterizes the failure to update the policy for 17 years as "a dereliction of duty" on the part of the board, including Williams.

{¶ 31} In response, the committee argues that LaRose's description of the situation is misleading. On February 25, 2021 (before LaRose rejected Williams's appointment), Reed sent another letter to Grandjean. Responding to the concern that the antidiscrimination and anti-harassment policy had not been updated since 2004, Reed passed along assurances from the insurance company that drafted the policy that the language was "current with industry standards." And Reed informed Grandjean that all full-time board employees received training from the county's human-resources department every two years. The committee asserts that LaRose omitted this information from his rejection letter "to create a false impression that board employees did not receive any training at all."

{¶ 32} To clarify that second point, Summit County Codified Ordinance 169.21 requires that all county employees receive antidiscrimination and anti-harassment training every two years. As a result, board employees receive

antidiscrimination and anti-harassment training from the Summit County Department of Human Resources. That training includes, for example, "Diversity and Inclusion Training" and "Sexual Harassment Training and Political Activity Training."

{¶ 33} LaRose contends that prior to February 2021, only one board employee had completed the mandatory county training between 2018 and 2020. As proof, he relies on an e-mail dated April 2, 2021, from Chip Clupper of the Summit County Department of Human Resources and an attached spreadsheet that were obtained by one of the attorneys who is representing LaRose in this case. Here again, LaRose is relying on evidence that he did not have when he drafted the rejection letter. And the quality of the evidence is dubious: an e-mail that is arguably hearsay and an exhibit that is not authenticated. But the more significant point is that although the parties dispute whether board employees have *undergone* training, that was not the issue LaRose raised in his rejection letter.

{¶ 34} His only point was that the policy had not been updated or circulated since 2004. LaRose ignored the evidence that the 2004 policy was consistent with current requirements and therefore did not necessarily need updating.

{¶ 35} Finally, LaRose makes no claim to have ordered county boards of elections to adopt anti-harassment or antidiscrimination policies. This contrasts with his requirement for members and employees of boards of elections to sign an "Ethics Policy Acknowledgement Form" acknowledging that they have reviewed the secretary of state's ethics policy and Ohio ethics laws and will comply with them. Section B(5)(b) of the secretary's ethics policy requires ethics training and states:

> All members and employees of the boards of elections shall participate in any training offered by the Secretary of State regarding ethics that is developed by the legal services, elections, and human

resources divisions of the Secretary of State's office in coordination
with other state ethics agencies

**{¶ 36}** The board complied with that requirement, but LaRose points out nothing in his ethics policy or any other directive regarding antidiscrimination and anti-harassment policies or training. Moreover, LaRose has not established that the board or any individual member of the board has the responsibility to implement and review antidiscrimination and anti-harassment policies.

**{¶ 37}** We hold that LaRose abused his discretion to the extent that he rejected Williams's appointment based on the second reason in his letter.

## 3. The third and fifth reasons: failure to cancel registrations for deceased electors and failure to maintain bipartisan administration of election functions

**{¶ 38}** Each month, the secretary of state sends the State and Territorial Exchange of Vital Events ("STEVE") report to the boards of elections. The STEVE report provides a list of deaths in each county for the purpose of removing deceased voters from the registration lists.

**{¶ 39}** The STEVE report includes a spreadsheet with a column labeled "County" with no other explanation. For some months, the board's employee who was processing the STEVE reports sorted the data by county and canceled only the names that were listed for Summit County. But the board later discovered that the "County" entry referred to the county in which the person died, not the county where the person was registered to vote. Although the employee sometimes processed the form correctly, at other times she did not. And as a result, a fraudulent ballot was cast in the 2020 general election in the name of a Summit County elector who was not removed from the rolls because she had died in Cuyahoga County.

**{¶ 40}** In the March 3 rejection letter, LaRose wrote:

3. In addition, ongoing audits of the Board's list maintenance process revealed numerous errors in processing of the State Territorial Exchange of Vital Events (STEVE), a report of deaths given monthly to each county board of elections. The failure to cancel voter registrations for deceased voters enabled at least one instance of documented voter fraud. This failure of oversight which led to the error likely occurred for years. Removing the deceased from the rolls is a basic responsibility and failure to do so risks fraud and loss of voter confidence.

{¶ 41} The parties dispute how widespread the STEVE-processing errors were and who discovered the problem. But the relevant issue is whether the problem represents a "failure of oversight" that reflects on Williams's competency to serve on the board.

{¶ 42} LaRose has not explained how the STEVE problem constitutes a failure of oversight. In Secretary of State Directive 2021-03, Section 1.12, at 3-52, available at https://www.ohiosos.gov/globalassets/elections/directives/2021/dir2021-03-ch03.pdf (accessed Apr. 23, 2021) [https://perma.cc/4X2G-8699], LaRose expressly describes the processing of the STEVE reports as a responsibility of "[b]oard staff." There is no indication that the board members are required by any directive to supervise this process personally, especially when it can be shown that just a single vote should not have occurred. While board members are not personally responsible for processing the STEVE report, this is not to say there should be no accountability for board members who fail to engage in appropriate oversight of staff to catch potential fraud. Here, however, we cannot see this particular situation as a basis for the secretary to find that Williams would not be a competent board member.

{¶ 43} LaRose's concern over the STEVE report is also stated in in his concerns about board staffing decisions.

> 5. The Board failed to ensure bipartisan control of election administration. It came to light that the Board assigned one person to each aspect of list maintenance, and there was inadequate oversight of the process.

{¶ 44} LaRose stated in his deposition that the "oversight" problem was that "critical aspects of elections administration" such as this should be "overseen by both a Republican and a Democrat." LaRose went on to say: "[Y]ou would never empower one party to unilaterally carry out a task without the other party overseeing it. Something as important as removal of a registration from the voter rolls should certainly receive that kind of bipartisan care and oversight." Grandjean makes the same point in her affidavit: "the Board only assigned one employee (instead of a bi-partisan team) to this task."

{¶ 45} Bipartisan administration of critical election functions is a check and balance aimed to prevent one political party from acting for its own partisan benefit. There is no hint of an allegation that the failure to remove deceased electors from the rolls was done to achieve a partisan advantage. The evidence in the record does not indicate that assigning a member of the opposite party to process the STEVE reports would have prevented the problem.

{¶ 46} The reason LaRose gave for his lack of confidence in Williams—the lack of bipartisan administration of these reports—does not withstand scrutiny. We therefore hold that LaRose abused his discretion to the extent that he rejected Williams's appointment based on the third and fifth reasons in his letter.

**4. The fourth reason: disenfranchising people convicted of felonies**

{¶ 47} The fourth reason reads:

> 4. The Board may have improperly cancelled the voter registration of persons convicted of felonies, but not incarcerated. This likely led to the disenfranchisement of legally qualified voters in Summit County. Not only is this clearly unacceptable but obviously exposes the Board to the risk of litigation.

{¶ 48} Under Ohio law, a person who is convicted of a felony "is incompetent to be an elector." R.C. 2961.01(A). The boards of elections receive information regarding felony convictions from two sources. At least once a month, the clerk of the common pleas court is required to file with the county board of elections the names and addresses of all persons convicted during the previous month of crimes that qualify the person for disenfranchisement. R.C. 3503.18(C). And with respect to federal felony convictions, the Department of Justice provides a list to the secretary of state, who passes that list on to the county boards. Upon receiving such a report, "the board of elections shall promptly cancel the registration of each elector named in the report." R.C. 3503.18(D).

{¶ 49} However, persons who have been disenfranchised due to a felony conviction *are* competent to be electors when granted parole, judicial release, a pardon, a conditional pardon (once the conditions have been performed), or release under a non-jail community-control sanction or postrelease-control sanction. R.C. 2961.01(A)(2). Based on this provision, the secretary has interpreted the law to be that only *incarcerated* individuals convicted of felonies should be stricken from the voter rolls.

{¶ 50} Prior to LaRose's March 3 rejection letter, the Summit County board was canceling the voter registration of every person listed on the felony-conviction reports. Thus, according to the secretary, the board may have been improperly disenfranchising nonincarcerated individuals convicted of felonies, who were

16

eligible voters. According to Grandjean, the board failed in its "responsibility to evaluate the felony conviction information that it receives [in the two reports] and to seek any additional information necessary to determine whether the individual is also incarcerated before removing the voter from the voter registration database."

{¶ 51} But if qualified electors were being removed from the rolls, it was at least partially a problem of the secretary's creation. In Secretary of State Directive 2021-03, Section 1.12, at 3-53, available at https://www.ohiosos.gov/ globalassets/elections/directives/2021/dir2021-03-ch03.pdf (accessed Apr. 23, 2021) [https://perma.cc/4X2G-8699], the secretary explained the process by which felony-conviction reports are sent to the boards. In the course of discussing the monthly reports from the county clerks of courts, the secretary expressly informed the boards that every name on the list is subject to disenfranchisement: "*Accordingly, the list should include only those names of persons who both have been convicted and incarcerated.*" (Emphasis added.) *Id.* Having first indicated to the boards that every name on the county lists meets both criteria for disenfranchisement, LaRose bears some responsibility for the lack of clarity that may have created error in Summit County.

{¶ 52} In her affidavit, Grandjean asserts that LaRose *did* instruct the boards to conduct their own investigation of both the county and federal lists. As support for her claim, she points to a letter to the county boards from LaRose, in which he wrote that "if any person on the enclosed list is registered to vote in your county, you must cancel that person's [registration] if you determine that the person is incarcerated." But those letters accompanied only the federal reports; the county reports were sent straight to the boards of elections without going through the secretary's office. So, it is incorrect for Grandjean to suggest that these letters gave any instructions regarding how to process the lists from the county clerks.

{¶ 53} The federal felony lists present a more complicated problem. The list from the Justice Department has a column labeled "Months Custody." For some of

the individuals convicted of felonies, that column has a number, but for others, the field is blank. In a February 2021 telephone conference with the secretary of state's staff, board chair Rich asked Grandjean and Chief Elections Counsel Jeff Hobday what the blanks meant, whether they signified that the person was not imprisoned or whether the data was simply incomplete for some reason. Grandjean and Hobday indicated that they did not know and that they would look into it. As of the date of her deposition, Grandjean stated that she had not received an answer from the Department of Justice and still did not know what the blanks meant.

{¶ 54} But if Grandjean does not know what the blanks mean, then she does not know whether these are nonincarcerated individuals convicted of felonies, which means she cannot know whether the board has in fact wrongly disenfranchised anyone. Criticism of the board for proceeding to disenfranchise individuals convicted of felonies whose names appear on the federal list without investigating what the blanks mean is not the same criticism that LaRose made in his rejection letter.

{¶ 55} The secretary of state is the chief election officer of the state, R.C. 3501.04, and yet the secretary's staff cannot explain to boards of elections what the federal reports mean and has only recently taken steps to find out. When asked whether the secretary's office investigates to make sure that the people on the federal list are incarcerated, Grandjean replied, "We are not required to." Given these facts, we are not persuaded that Williams is incompetent on the basis that his board, receiving incomplete instruction from the secretary of state, may have disenfranchised the people on the federal list, as it was apparently required to do, without knowing what the blanks on the lists given the board signify.

{¶ 56} We hold that LaRose abused his discretion to the extent that he rejected Williams's appointment based on the fourth reason in his letter.

### 5. The sixth reason: lack of cross-training

{¶ 57} Next, LaRose wrote:

6. The Board failed to cross-train employees on election administration tasks and ensure that there was correct continuity of operations when there is turnover in staffing.

**{¶ 58}** This assertion is not supported by the record. Three board members attested that all eight front-office clerks are cross-trained on processing voter registrations and candidate filings, updating and canceling registrations, verifying petition signatures, and performing other administrative tasks. LaRose, on the other hand, testified that he does not "have evidence one way or the other" regarding the training of the employees. Cecilia Robart makes this allegation in her affidavit, but, again, LaRose did not have that evidence when he wrote the rejection letter, so it is unclear what basis he had for the assertion.

**{¶ 59}** Rather than defend the assertion, LaRose's merit brief changes his reason. He complains in his brief that the board staff has no standard operating procedures or employee handbook and does not receive formalized written performance reviews. But no matter whether those claims are true, they were not given by LaRose as a reason for rejecting Williams's appointment and cannot be offered as post-hoc justifications for the decision.

**{¶ 60}** We hold that LaRose abused his discretion to the extent that he rejected Williams's appointment based on the sixth reason in his letter.

**6. The seventh reason: traffic-control problems during early voting**

**{¶ 61}** Finally, LaRose accused the board of failing to prepare adequately for a high volume of early voters in the 2020 general election.

7. The Board failed to adequately prepare for and execute efficient early in-person voting and control traffic issues during early voting for the November 3, 2020 General Election. The Board

should have heeded our warnings over the summer to expect at least a doubling in absentee and early voting and make adequate preparations to accommodate increased traffic. Even after I personally contacted the Board Chair regarding the unacceptable mismanagement of ballot drop off traffic, the Board failed to address the situation. Many other boards set up multiple drive through drop-off lanes and provided adequate staff and law enforcement presence to effectively manage the increase in traffic which was predictable and expected.

The evidence suggests that the traffic congestion during early voting was partly a problem of LaRose's creation and partly a consequence of unavoidable factors.

{¶ 62} In the spring of 2020, LaRose began alerting the boards to prepare for the number of early absentee voters to double from previous years. In August 2020, LaRose directed the boards to have at least one drop box at each facility to receive early ballots. At the same time, LaRose prohibited the boards from placing drop boxes in any location other than at the board office itself.

{¶ 63} The Summit County board of elections office is located on Grant Street. The board arranged for traffic arriving from Grant Street to travel through the parking lot in a one-way flow around the building to the drop box and back to Grant Street at a different exit.

{¶ 64} Close to 60 percent of all ballots in the 2020 general election were cast before election day. The board experienced a few days of heavy traffic from the combination of people returning absentee ballots and voting early in-person. The problem, according to board chair Rich, was that just before the board office, Grant Street narrows from four lanes to two. In other words, the congestion was not due to the arrangements at the board but resulted from a traffic bottleneck on the street approaching the board office.

{¶ 65} LaRose learned of the heavy traffic from social media and news reports and called Rich. LaRose urged Rich to place a bipartisan team of ballot collectors on Grant Street in front of the board office, but Rich believed that would actually slow down the process even more. Instead, Rich proposed stationing bipartisan teams on a nearby road, Exchange Street, so drivers would not have to turn onto Grant Street at all. Alternatively, Rich proposed placing collection teams on Grant Street at a point before the bottleneck. According to Rich, LaRose vetoed those suggestions because he felt the collection teams would be located too far from the board office. LaRose testified in his deposition that he "didn't give specific guidance" for how to solve the problem because doing so "would [not] have been appropriate."

{¶ 66} LaRose fails to connect the traffic-flow problems during early voting to any action or inaction by Williams. LaRose made the decision to prohibit ballot drop boxes at any location other than the board of election office itself. Williams had no control over the high volume of early voting or the bottleneck traffic pattern on Grant Street. LaRose does not dispute Rich's assessment that the traffic problems stemmed from the bottleneck on Grant Street rather than from the configuration the board had selected for drivers once they reached the board's parking lot. Nor does he contest Rich's opinion that setting up staffed drive-through drop-offs in the board's parking lot, what LaRose calls "a Chick-fil-A-style drive-through where you have multiple lanes," would have tied up traffic *more*, not less. And finally, LaRose does not testify that the congestion could have been prevented if the board had taken some other action.

{¶ 67} We hold that LaRose abused his discretion to the extent that he rejected Williams's appointment based on the seventh reason in his letter.

*E. Additional rationales for the rejection of the recommendation*

{¶ 68} The rejection letter contained an eighth justification for rejecting the committee's recommendation, beyond the numbered points discussed above.

LaRose wrote that "[t]hough you [Williams] have many years of experience overseeing the Summit County Board of Elections, this long tenure has been marred by a history of conflict within the Board and missteps in administering elections." However, Williams's fellow board members, Rich and Bevan (both Democrats), described Williams as "professional and collegial." And LaRose could point to no evidence of conflict between Williams and his Democratic counterparts on the board.

{¶ 69} In his merit brief, LaRose raises a number of new allegations against Williams. In addition to the reasons cited above, Grandjean's affidavit refers to a complaint the secretary received from the Summit County Health Department that board employees were refusing to wear masks at work in violation of COVID-19-related health orders. And she avers that the board approved a COVID-19 policy but neglected to circulate it to the staff. Here again, LaRose did not provide these specific allegations as bases for Williams's alleged incompetency and cites no authority for the proposition that he can defend his decision by raising these new, specific allegations that were not part of his stated reasons for the rejection. Because these allegations were raised for the first time in LaRose's merit brief and the committee has had no opportunity to take discovery or test the truthfulness of the allegations, we decline to consider them.

### III. CONCLUSION

{¶ 70} The committee has met its burden of proof to show that LaRose's reasons for rejecting Williams's appointment were not valid and that he abused his discretion. We therefore grant a writ of mandamus ordering LaRose to reappoint Williams to the Summit County Board of Elections.

Writ granted.

O'CONNOR, C.J., and KENNEDY, FISCHER, DEWINE, STEWART, and BRUNNER, JJ., concur.

DONNELLY, J., concurs, with an opinion.

---

**DONNELLY, J., concurring.**

{¶ 71} I agree wholeheartedly that mere rumors, suspicions, and anonymous complaints that are not substantiated by any investigation are not an appropriate basis to conclude that an appointee is incompetent to serve on a county's board of elections under R.C. 3501.07. *See State ex rel. Lorain Cty. Democratic Party Executive Commt. v. LaRose*, ___ Ohio St.3d ___, 2021-Ohio-1144, ___ N.E.3d ___, ¶ 24-25 (Donnelly, J., dissenting), discussing *State ex rel. Lucas Cty. Republican Party Executive Commt. v. Husted*, 144 Ohio St.3d 352, 2015-Ohio-3948, 43 N.E.3d 411, ¶ 27. Consistent with my dissenting opinion in *Lorain Cty. Democratic Party Executive Commt.*, I concur in the decision to grant a writ of mandamus compelling respondent, Secretary of State Frank LaRose, to reappoint Bryan C. Williams to the Summit County Board of Elections.

---

Roetzel & Andress, L.P.A., Stephen W. Funk, and Emily K. Anglewicz, for relator.

Dave Yost, Attorney General, and Julie M. Pfeiffer, Michael A. Walton, and Caitlyn N. Johnson, Assistant Attorneys General, for respondent.

---