[Cite as *State ex rel. AWMS Water Solutions, L.L.C. v. Mertz*, 2022-Ohio-4571.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

STATE OF OHIO ex rel. AWMS WATER
SOLUTIONS, LLC, et al.,

Relators,

- v -

MARY MERTZ, DIRECTOR OHIO
DEPARTMENT OF NATURAL
RESOURCES, et al.,

Respondents.

CASE NO. 2016-T-0085

Original Action for Writ of Mandamus

**PER CURIAM**
**OPINION**

Decided: December 19, 2022
Judgment: Petition denied

*Matthew G. Vansuch* and *Brian A. Coulter*, Brouse McDowell, LPA, 6550 Seville Drive, Suite B, Canfield, OH 44406; *Kyle A. Shelton*, Brouse McDowell, LPA, 388 South Main Street, Suite 500, Akron, OH 44311 (For Relators).

*Dave Yost*, Ohio Attorney General, State Office Tower, 30 East Broad Street, 16th Floor, Columbus, OH 43215; *W. Scott Myers* and *Brett A. Kravitz*, Assistant Attorneys General, Environmental Enforcement Section, 2045 Morse Road, Suite A-3, Columbus, OH 43229-6693; *Matthew E. Meyer*, Assistant Attorney General, Environmental Enforcement Section, 30 East Broad Street, 25th Floor, Columbus, OH 43215 (For Respondents).

PER CURIAM.

{¶1}    This matter came for trial before this court on relators', AWMS Water Solutions, LLC, et al. (collectively "AWMS"), petition for writ of mandamus filed against respondents, Mary Mertz, Director, Ohio Department of Natural Resources, et al. (collectively "the Division").   Trial was held commencing on September 20, 2021, and

concluded on October 1, 2021. The parties filed post-trial briefs in support of their relative positions. Also, this court requested additional briefing on a pivotal but under-addressed issue of what, if any, cognizable property interest was allegedly taken by the Division's actions. Both parties filed their supplemental briefs. AWMS argued it possessed a cognizable interest in both the lease and the permit to inject, which was suspended, and, hence, this court must proceed to analyze the merits of their taking claim. The Division argued AWMS possessed no cognizable property interest, and, as a result, AWMS is not entitled to a writ of mandamus necessitating an order to commence appropriation proceedings.

{¶2} **I. SUMMARY OF THE FACTS AND HOLDING**

{¶3} After leasing acreage in Weathersfield Township, Trumbull County, Ohio, AWMS sought and obtained two Level II injection well permits to inject wastewater brine deep into the subsurface areas of the leased property. To obtain the permits, AWMS was required to follow specific statutory procedures and submit to significant governmental oversight. The oversight was premised upon certain inherent risks attendant to injecting wastewater, not the least of which is the risk of inducing earthquakes. Shortly after injection commenced, two seismic events took place – the first, a 1.7M event ("M" = "magnitude"); the second, a 2.1M event.

{¶4} The seismic events prompted the Division to issue suspension orders on both wells. Shortly thereafter, the shallower of the two wells was permitted to continue operation (which AWMS ultimately closed due to economic losses), but the second well remained closed. Although AWMS attempted to meet the Division's requests for a restart plan of the second well, the suspension order remained active. After unsuccessfully challenging the suspension order, AWMS filed the instant action seeking an order

2

requiring the Division to file appropriation proceedings based upon an alleged unconstitutional taking requiring just compensation.

{¶5} The matter eventually proceeded to trial. A necessary legal hurdle to overcome for this court to proceed to the merits of the case, however, was neither broached, let alone discussed, until after the trial's conclusion; namely, whether AWMS possessed a cognizable property interest under the law such that it is entitled to both an analysis of the merits of its claim as well as whether it might prevail. Because AWMS has failed to establish a cognizable property interest contemplated under the Fifth Amendment's Just Compensation Clause, we conclude the Division is entitled to judgment as a matter of law and deny AWMS' petition for writ of mandamus.

{¶6} **II.  FACTUAL AND PROCEDURAL BACKGROUND**

{¶7} AWMS is a company involved in disposing wastewater from oil and gas production sites and drilling sites. Respondents are Mary Mertz, the Director of the Ohio Department of Natural Resources ("Director"); the ODNR; Richard Simmers, the former Chief of the Division of Oil and Gas Resources Management ("Chief"); and the Division.

{¶8} AWMS secured a lease on 5.2 acres of property ("the Site") in an industrial area in Weathersfield Township, which it acquired for the purpose of constructing and operating salt-water injection wells, also known as Class II disposal wells. The Site is located in the urban area of Weathersfield Township, near the city of Niles. Schools, residences, the Mineral Ridge Dam, a fire department, a hospital, and other infrastructure are within three miles of the Site.

{¶9} **A.  AWMS APPLIES FOR PERMITS**

{¶10} On December 23, 2011, AWMS applied to the Division for permits to construct the wells, designated AWMS #1 Well and AWMS #2 Well. At the time AWMS

3

submitted its applications for drilling permits, it had invested approximately $100,000 into the development of the Site. The Division's procedure for obtaining authorization to operate a Class II injection well is a two-step process. First, an applicant must apply for a permit to drill and construct a Class II injection well, and second, the applicant must apply to inject into the well.

{¶11} Also, between March and December 2011, six seismic events of varying magnitudes were detected in Youngstown, Ohio, near an injection well designated "Northstar #1," operated by a third party not connected to this matter. On December 24, 2011, a 2.7 magnitude earthquake was recorded within one mile of the well. After reviewing the seismic data, the Division found that Northstar #1 Well likely induced the earthquake. On December 31, 2011, one day after Northstar #1 Well voluntarily ceased operations at the Division's request, a 4.0 magnitude event was recorded within one mile of the well. Northstar #1 Well is located approximately seven miles from the Site. After the second seismic event, the Division temporarily halted the issuance of permits through November 2012. During the pause in permit issuances, the Division drafted emergency rules to protect the public health and safety.

{¶12} On July 18, 2013, the Division issued a drilling permit to AWMS. In September 2013, AWMS furnished a confidential offering memorandum to potential qualified investors to raise the capital to construct the wells on the Site. Among other things, including projected production volume of the wells, the memorandum identified "risk factors," emphasizing that the securities at issue "involve a high degree of risk" and prospective investors should be aware of these risks. The memorandum highlighted the "continuing risk" of "seismic events similar to the one that occurred in the Youngstown, Ohio area." The memorandum additionally noted that, due to the inherent risks of

4

operating a well site, there is a possibility that well operations could be suspended and/or terminated by the Ohio Environmental Protection Agency and/or the ODNR. The memorandum also outlined certain geologic risks. It stated that AWMS had performed no "subsurface testing." As a result, the memorandum disclosed that the adequacy of the geology and the suitability of the wells "will only be known upon drilling, completion, and operation of the wells."

{¶13} **B. AWMS BEGINS OPERATIONS**

{¶14} AWMS #1 Well was drilled to a true vertical depth of 4,403 feet below ground surface, and AWMS #2 Well was drilled to a true vertical depth of 8,502 feet below ground surface. On March 24, 2014, an operational permit was issued. Full commercial operations of the wells commenced in May and June of 2014. AWMS installed four seismic monitoring stations for monitoring seismic activity around the Site and surrounding community in accordance with and at the request of the Division.

{¶15} During July 2014, AWMS injected 71,434 barrels of fluid, and, in August 2014, it injected 54,734 barrels. During the time the wells were operating, AWMS #1 Well represented 5% of total injections between the two wells, while AWMS #2 Well represented 95% of total injections. AWMS generated a gross income of $242,799 in July 2014 and $170,695 in August 2014.

{¶16} On July 28, 2014, a seismic event measuring a magnitude of 1.7 occurred in Trumbull County in the vicinity of AWMS' wells. ODNR did not receive any "felt reports" for the July event.[1] On August 31, 2014, another seismic event occurred in the vicinity of the wells measuring 2.1M. The earthquakes were connected in time and space with

_____

1. When a member of the public feels a seismic event, it is known as a "felt event."

5

Case No. 2016-T-0085

injections at AWMS #2 Well, and experts agreed that the events were likely induced by AWMS' operations.

**{¶17} C.  ODNR ISSUES SUSPENSION ORDER**

**{¶18}** On September 3, 2014, the Division issued Chief's Order No. 2014-372, amended by Chief's Order No. 2014-374 ("Suspension Order"), ordering AWMS to (1) immediately suspend all operations at AWMS #2 Well, and (2) submit a written plan to the Division for evaluating certain "seismic concerns associated with the operation of the AWMS #2 saltwater injection well."  The Division also suspended operations at AWMS #1 Well but subsequently terminated this suspension after AWMS submitted additional information that AWMS #1 Well did not contribute to the earthquake activity.  Following the termination of the Suspension Order on AWMS #1 Well, AWMS injected into AWMS #1 Well from September 2014 until September 2015.  The monthly revenues generated from the AWMS #1 Well did not cover the monthly expenses incurred to keep the facility running.  In effect, AWMS was unable to inject the volumes at the AWMS #1 Well that it had expected in its confidential offering memorandum.

**{¶19}** AWMS submitted a plan to restart its operations at AWMS #2 Well; the Division found, however, that the plan was deficient, was "generic and inadequate," and did not support terminating the Suspension Order.  AWMS #2 Well has not operated since imposition of the Suspension Order.

**{¶20} D.  PROTRACTED ADMINISTRATIVE AND JUDICIAL PROCEEDINGS**

**{¶21}** AWMS appealed the Suspension Order to the Ohio Oil & Gas Commission ("Commission").  On February 24, 2015, the Division and AWMS met to discuss resolution of the appeal of the Suspension Order.  The Division provided AWMS with a list of 14 criteria consisting of additional tools and/or recommendations for AWMS to consider in

6

aid of potentially restarting AWMS #2 Well. A hearing was held on AWMS' appeal of the Order, at which the Division's former Chief, Mr. Simmers, issued a report and testified that "AWMS has not submitted a plan with sufficient detail or information to minimize risk presented by induced seismicity." Additionally, he testified that if AWMS "presented a very comprehensive plan; then it's possible we would consider that plan." Experts for AWMS testified that, in their view, AWMS' plan was reasonable but could also not conclude the Suspension Order was unreasonable. Still, AWMS' experts opined that the Order was unnecessary.

{¶22} In August 2015, the Commission found the Chief's issuance of the Suspension Order was not unlawful or unreasonable and affirmed the Division's issuance of the Suspension Order. AWMS filed an appeal of the Commission's affirmance of the Suspension Order to the Franklin County Court of Common Pleas. Meanwhile, in November 2016 and on December 20, 2016, ODNR informed AWMS through letters from its counsel that, consistent with former Chief Simmers' testimony at the March 2015 Commission hearing, the Division was open to considering a comprehensive plan from AWMS that properly minimized risk.

{¶23} On December 23, 2016, the court of common pleas found that the Suspension Order was lawful but reversed the judgment of the Commission, concluding the Order was unreasonable. The Division appealed this decision to the Tenth District Court of Appeals.

{¶24} Meanwhile, on August 26, 2016, AWMS filed the instant petition for writ of mandamus alleging the continued enforcement of the Suspension Order had substantially interfered with AWMS' property rights by depriving them of all, or at least partial, economically viable use of the property. In light of the appeal to the Tenth Appellate

7

District, this court stayed the underlying proceedings due to the possibility of rendering an inconsistent ruling contrary to the jurisdictional-priority rule.

{¶25} On July 31, 2018, in the administrative appeal, the Tenth District reversed the judgment of the court of common pleas in part, concluding, inter alia, the lower court based its decision on impermissible evidentiary inferences made between experts who testified before the division *and* the trial court drew conclusions regarding the likelihood of seismic risk without reliable evidentiary support. *See Am. Water Mgt. Servs., LLC v. Div. of Oil & Gas Resources Mgt.*, 2018-Ohio-3028, 118 N.E.3d 385, ¶ 57 (10th Dist.). The Tenth District therefore determined the Suspension Order was reasonable and reinstated the same. *See id.* at ¶ 59. AWMS filed a jurisdictional appeal with the Supreme Court of Ohio, and, on November 21, 2018, the court declined jurisdiction. *See Am. Water Mgt. Servs., L.L.C. v. Div. of Oil & Gas Resources Mgt.*, 154 Ohio St.3d 1431, 2018-Ohio-4670, 111 N.E.3d 1192. On December 26, 2018, the court denied AWMS' motion for reconsideration. *See Am. Water Mgt. Servs., L.L.C. v. Div. of Oil & Gas Resources Mgt.*, 154 Ohio St.3d 1467, 2018-Ohio-5209, 114 N.E.3d 216.

{¶26} This court subsequently lifted the stay and proceeded to consider the Division's motion for summary judgment and AWMS' memorandum in opposition. On March 15, 2019, after considering the parties' pleadings, this court entered summary judgment in the Division's favor, concluding AWMS failed to create a genuine issue of material fact requiring trial on both their categorical-regulatory takings claim and their partial-regulatory takings claim. *See State ex rel. AWMS Water Solutions, LLC v. Zehringer*, 2019-Ohio-923, 132 N.E.3d 1151, ¶ 17, ¶ 50 (11th Dist.).

{¶27} AWMS filed a direct appeal to the Supreme Court of Ohio, and, on December 2, 2020, the court reversed this court's order entering summary judgment. *See*

8

Case No. 2016-T-0085

*State ex rel. AWMS Water Solutions, L.L.C. v. Mertz*, 162 Ohio St.3d 400, 2020-Ohio-5482, 165 N.E.3d 1167.  The Supreme Court determined there were genuine issues of material fact for trial on both AWMS' categorical-regulatory takings claim and their partial-regulatory takings claim and remanded the case to this court for further proceedings.  *See id.* at ¶ 88-89.  The threshold issue of whether AWMS possessed a cognizable property interest that would trigger a takings analysis, however, was neither briefed nor addressed by this court or the Supreme Court.

{¶28}  Subsequently, on May 21, 2021, Chief Vendel issued Chief's Order No. 2021-97, which terminated the Suspension Order ("Restart Order").  The Restart Order authorized AWMS to resume injection operations at the AWMS #2 Well by modifying operational conditions of the Suspension Order.  In July 2021, AWMS appealed the Restart Order to the Commission.  To date, AWMS has not sought a stay of the Restart Order and has not resumed injection operations at the AWMS #2 Well.  AWMS #2 Well has not operated since September 2, 2014.

{¶29}  In light of the Supreme Court's remand order, the matter proceeded to trial.

{¶30}  **III.  MANDAMUS**

{¶31}  In order for a writ of mandamus to issue, AWMS must establish a clear legal right to compel the Division to initiate an appropriation action, the Division's corresponding duty to institute the action, and the lack of an adequate remedy for AWMS in the ordinary course of law.  *See State ex rel. Duncan v. Mentor City Council*, 105 Ohio St.3d 372, 2005-Ohio-2163, 826 N.E.2d 832, ¶ 10.

{¶32}  The "standard of proof" is the threshold quantum of evidence that a party must establish in order to be entitled to the relief requested.  *State ex rel. Todd v. State Teachers Retirement Sys.*, 6th Dist. Lucas No. L-15-1267, 2016-Ohio-5073, ¶ 17.  The

9

standard of proof placed upon a relator seeking a writ of mandamus is heightened. *See State ex rel. Doner v. Zody*, 130 Ohio St.3d 446, 2011-Ohio-6117, 958 N.E.2d 1235, ¶ 56. "Parties seeking extraordinary relief bear a more substantial burden in establishing their entitlement to this relief." *Id.* In a mandamus case, a relator must prove its entitlement to a writ by clear and convincing evidence. *See State ex rel. Summit Cty. Republican Party Executive Commt. v. LaRose*, 165 Ohio St.3d 185, 2021-Ohio-1464, 177 N.E.3d 218, ¶ 8. Clear and convincing evidence is "intermediate" evidence, in that it requires more than a preponderance of evidence, but less than evidence beyond a reasonable doubt. *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Id.*

**{¶33}** "[M]andamus is the vehicle for compelling appropriation proceedings by public authorities where an involuntary taking of private property is alleged." *State ex rel. Levin v. Sheffield Lake*, 70 Ohio St.3d 104, 108, 637 N.E.2d 319 (1994). "In such actions, the court, as the trier of fact and law, must determine whether any property rights of the owner have been taken by the public authority." *Id*.

**{¶34}** <u>**IV.  REGULATORY TAKINGS DOCTRINE**</u>

**{¶35}** AWMS claims it is entitled to compensation for the state's regulatory taking of its property under the Takings Clause of the Fifth Amendment to the United States Constitution. The Takings Clause of the Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation." This clause applies to the individual states by virtue of the Fourteenth Amendment to the United States Constitution. *See Barber v. Charter Twp. of Springfield*,

*Michigan*, 31 F.4th 382, 387 (6th Cir.2022). Moreover, the Takings Clause applies to both ownership interests in fee and unexpired leasehold interests. *See Alamo Land & Cattle Co., Inc. v. Arizona*, 424 U.S. 295, 303, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976) ("It has long been established that the holder of an unexpired leasehold interest in land is entitled, under the Fifth Amendment [of the United States Constitution], to just compensation for the value of that interest * * *.") (Footnote omitted.)

**{¶36}** Originally, the federal Takings Clause was thought to apply only to situations where the direct appropriation of property or the functional equivalent of a practical elimination of an owner's possession. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). The Supreme Court of the United States has recognized, however, that the clause may also be applied to overly burdensome governmental regulations of property. *See Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922) ("[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking").

**{¶37}** The Court has established guidelines for identifying regulations that go too far. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538-540, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005). "The rub, of course, has been—and remains—how to discern how far is 'too far.'" *Id.* at 538. "In answering that question, we must remain cognizant that 'government regulation—by definition—involves the adjustment of rights for the public good,' and that '[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law[.]'" (Internal citation omitted.) *Id.*, quoting *Mahon* at 413.

**{¶38}** With the foregoing in mind, federal courts have established a two-part test to determine whether government actions amount to a taking of property under the Fifth

11

Amendment. First, a court must determine whether a party possesses a cognizable property interest in the subject of the alleged taking.[2] *See Conti v. United States*, 291 F.3d 1334, 1339 (Fed.Cir.2002), *cert. denied*, 537 U.S. 1112, 123 S.Ct. 904, 154 L.Ed.2d 785 (2003). Second, once a court has determined a property interest exists, it must determine whether a taking occurred. *Id.* "If the claimant fails to demonstrate the existence of a legally cognizable property interest, the court[']s task is at an end." *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed.Cir.2004), *cert. denied*, 545 U.S. 1139, 125 S.Ct. 2963, 162 L.Ed.2d 887 (2005). "The question of whether [AWMS] owned a compensable property interest presents 'a question of law based on factual underpinnings.'" *Mohlen v. United States*, 74 Fed.Cl. 656, 660 (Fed.Cl.2006), quoting *Walcek v. United States*, 303 F.3d 1349, 1354 (Fed.Cir.2002).

{¶39} Regarding the concept of a cognizable property interest, "'the Fifth Amendment concerns itself solely with the "property," i.e., with the owner's relation as such to the physical thing and not with other collateral interests which may be incident to his ownership.'" *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 217 (Fed.Cir.1993), *cert. denied*, 511 U.S. 1106, 114 S.Ct. 2100, 128 L.Ed.2d 662 (1994) ("*Mitchell Arms II*"), quoting *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945). Further, in order to have a cognizable property interest, one "'must have more than an abstract need or desire for it * * * [or] a unilateral expectation of it,' and 'must, instead, have a legitimate claim of entitlement to it.'" *Horne v. Mayor & City Council*

---

2. For purposes of the Fifth Amendment's Takings Clause, the phrases "property interest," "cognizable property interest," and "compensable property interest" are generally used in caselaw interchangeably. Accordingly, if one lacks a "Fifth Amendment property interest," a "cognizable property interest," or a "compensable property interest," one is not entitled to a Just-Compensation Takings analysis.

Case No. 2016-T-0085

*of Baltimore*, 349 Fed.Appx. 835, 838 (4th Cir.2009), quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

{¶40} Moreover, "[w]e determine whether an asserted right is one of the rights in the bundle of sticks of property rights that inheres in a *res* by looking to 'existing rules or understandings' and 'background principles' derived from an independent source such as state, federal, or common law." (Emphasis sic.) *Am. Pelagic Fishing Co.*, *supra*, at 1376, quoting *Lucas*, *supra*, at 1030. Moreover, "'in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the owner] ought to be aware of the possibility that new regulation might even render his property economically worthless * * *.'" *Id.*, quoting *Lucas* at 1027. In this respect, "there is a distinction between simply not being disturbed in the particular use of one's property and having the *right* to that use of the property. Clearly, in order for there to be a cognizable property interest sufficient to support a takings claim, the latter must be true." (Emphasis sic.) *Id.*

{¶41} **V. ANALYSIS**

{¶42} **A. WHAT PROPERTY INTEREST, IF ANY, WAS ALLEGEDLY TAKEN?**

{¶43} AWMS purchased a leasehold in the property for purposes of constructing and operating salt-water injection wells. It obtained permits to drill wells and inject brine. Both wells were initially shut down, but AWMS #1 Well was subsequently allowed to re-commence injection; thus, there is no meaningful argument that any property interest AWMS possessed in AWMS #1 Well and/or its permit was taken such that it would be entitled to compensation for Fifth Amendment purposes. The subject of AWMS' claim for relief, therefore, is the property interest it had in its lease, its well/equipment, and/or its permit and whether that (or those) interest(s) rises to the level of a cognizable property

13

interest as a matter of law. AWMS asserts it has a cognizable property interest, for purposes of a Fifth Amendment takings claim, in the lease, its well, and the permit issued by the Division. We shall address each of these points individually.

**{¶44} B. PROPERTY INTEREST IN THE LEASE**

{¶45} Initially, AWMS contends that, in reversing this court's award of summary judgment, the Supreme Court of Ohio held AWMS has a protected property interest in the lease. Specifically, AWMS cites the court's observation that "'the holder of an unexpired leasehold interest in land is entitled' to invoke the Takings Clause's guarantees." *Mertz*, *supra*, at ¶ 26, quoting *Alamo Land*, *supra*, at 303. To be sure, as the court noted, "'"[e]very sort of [real property] interest the citizen may possess" counts as a property interest under the Fifth Amendment.'" *Id.*, quoting *Cienega Gardens v. United States*, 331 F.3d 1319, 1329 (Fed.Cir.2003), quoting *Gen. Motors Corp.*, *supra*, at 378. The question is not whether AWMS has some property interest in its lease, it clearly does; the question germane to this matter is what property interest, if any, was taken via the Division's Suspension Order.

{¶46} The Supreme Court, in issuing its remand order, *did not* hold that AWMS had a cognizable property right in the lease or permit under the Fifth Amendment's Just Compensation Clause. Indeed, on appeal from the grant of summary judgment, the legal question of whether AWMS possessed a cognizable property interest was not at issue. Despite the sine qua non character of this preliminary legal point, the issue of AWMS' alleged cognizable property interest was not discussed or briefed until closing arguments and post-trial briefing. As such, neither this court nor the Supreme Court had occasion to comment on whether the property interest AWMS possessed was a *cognizable* and thus compensable property interest under the Fifth Amendment's Takings Clause.

14

Case No. 2016-T-0085

{¶47} At most, in the above quote cited by AWMS, the Supreme Court was noting that AWMS was prima facie entitled to invoke the constitutional right to just compensation; this did not imply, however, AWMS was entitled to relief or even an analysis of such an entitlement if it could not establish a cognizable property interest. In short, the Supreme Court's passing observation vis-à-vis AWMS' right to "invoke" the Fifth Amendment's guarantee did not establish AWMS possessed any such interest.

{¶48} Adjunctly, AWMS argues the Division conceded that AWMS possessed an extensive property interest in its lease, i.e., the Division regularly pointed out AWMS could utilize the property for other purposes, not the least of which would be obtaining additional permits to drill in alternative areas on the property. We discern nothing inconsistent with the Division's concession of AWMS' property right in the leasehold and its concomitant denial that it engaged in a compensable taking of a cognizable property interest. AWMS' leasehold rights remained intact even though AWMS #2 Well was shut down. There is nothing preventing AWMS from securing additional permits for the narrow purpose of its lease. Regardless of the economical and logistical feasibility of this option, such an option is still available and would allow AWMS to retain some use regardless of the Suspension Order.

{¶49} Again, while we recognize AWMS possesses a property right in its lease, the real question is whether that right is cognizable such that it is entitled to a just-compensation analysis. In *Mitchell Arms II*, *supra*, the Federal Circuit Court of Appeals addressed a similar point. Specifically, the plaintiff in *Mitchell Arms II* was a federally-licensed arms importer who entered into a contract to purchase Yugoslavian assault rifles. The plaintiff imported rifles pursuant to the contract and its permits throughout 1987 and 1988. In March of 1989, however, the Bureau of Alcohol, Tobacco, and Firearms ("ATF")

15

issued an announcement suspending the import of assault rifles under existing permits. The plaintiff filed suit, asserting its reliance on the issued permits constituted "property" and thus the suspension constituted a taking under the Fifth Amendment. The Federal Claims Court dismissed the plaintiff's complaint for failure to state a claim. *Id.* at 213-215.

{¶50} On appeal, the court rejected the plaintiff's assertion, reasoning that in revoking the import permit, the government did not take the rifles, and the plaintiff could have done anything it wished with them except import them into the United States. *Id.* at 217. The court underscored that the Fifth Amendment addresses "property" and the owner's relation to that property, but not with collateral interests that might be incident to that ownership. *Id.* As such, the plaintiff's expectation that it would be allowed to import and then sell those weapons in the United States was a collateral interest that "'comes into being only upon the issuance of an import permit.'" *Id.*, quoting *Mitchell Arms, Inc. v. United States*, 26 Cl.Ct. 1, 6 (Cl.Ct.1992) ("*Mitchell Arms I*").

{¶51} Here, although we are currently concerned with the nature of AWMS' property interest in its lease, the foregoing points are instructive. AWMS entered into its lease with an awareness that injection wells are subject to pervasive governmental control. And AWMS' lease afforded it only the extremely narrow right to inject brine. Just as the plaintiff's ability in *Mitchell Arms II* to import and sell rifles was entirely subject to the ATF's regulatory power, so was (and is) AWMS' ability to inject brine subject to the Division's overarching oversight. And, as a result, even though AWMS had an expectation (particularly after receiving its permits) to utilize its leasehold pursuant to its terms, its collateral interest in injecting brine came into being only upon the issuance of the relevant injecting permits. Hence, any expectation AWMS had in using its lease for

16

the narrow purpose for which it entered, the same cannot constitute a property right protected by the Fifth Amendment.

**{¶52}** Further, in order to have a cognizable property interest in the lease, AWMS must have more than an abstract or one-sided expectation for that which the leasehold granted. *Horne*, *supra*, at 838. Rather, it must demonstrate "'a legitimate claim of entitlement'" to the property interest. *Id.*, quoting *Roth*, *supra*, at 577.

**{¶53}** The Suspension Order required AWMS to cease injecting brine. As just noted, AWMS was legally allowed to inject brine, subject to significant regulatory oversight, through the Division's issuance of a permit pursuant to R.C. Chapter 1509. The lease did not and could not confer a right to inject brine. Instead, it only afforded AWMS the right to apply for a permit, without which (or without special permission by the Division's Chief) AWMS could not inject wastewater. *See* R.C. 1509.22(D).

**{¶54}** A review of the lease itself does not (nor could it, given the highly regulated nature of wastewater injection) afford AWMS any guaranteed interest that it would be conclusively able to inject brine on any aspect of the property; in other words, it does not confer or purport to confer a specific property interest in the industrial activities which are at the heart of AWMS' takings claim. The lease merely affords AWMS the exclusive right to operate Class II disposal wells and install, operate, and maintain infrastructure. AWMS' ability to utilize these provisions of the lease, however, were fundamentally conditioned on its ability to secure the necessary permits.

**{¶55}** While the lease conferred certain rights of use, those rights were not inherent in the instrument itself; rather, they were necessarily dependent on AWMS meeting specific statutory criteria established by the General Assembly and administered

17

Case No. 2016-T-0085

as well as enforced by the Division.[3] The lease represented a gamble, like many facets of this highly regulated industry, which, without the synergy of various surrounding circumstances, might easily eventuate in a "bust." Although AWMS' ability to do what it desired to do on the leased property was halted by virtue of the Suspension Order, the lease did not represent an assurance that AWMS was entitled to fulfill its aspirations under the instrument. AWMS, consequently, only possessed a "unilateral expectation" in its lease, the scope of which was limited to injecting brine, not the "legitimate claim of entitlement" necessary for a cognizable property interest. In short, AWMS has failed to establish a cognizable property interest under the Fifth Amendment in its lease that would necessitate a just compensation/takings analysis.

**{¶56} C. PROPERTY INTEREST IN WELLS AND EQUIPMENT**

**{¶57}** AWMS also contends it has a cognizable property interest in its well and all attendant equipment in which it invested for its business. While AWMS has a property interest in its physical investments, the Division did not physically commandeer the infrastructure. To the contrary, the infrastructure's use was halted due to the Suspension Order, which was deemed lawful and reasonable during the administrative appeals process. In this regard, even if AWMS could establish a cognizable property interest in the equipment, we fail to see how the physical investments installed on the leasehold property, which were only operable by virtue of AWMS securing a permit, were taken.

---

3. The legal reality that the injection-well industry is highly regulated in Ohio foreshadows an additional reason why AWMS has no cognizable property interest in its lease. As will be discussed below in significant detail, the traditional features of a cognizable property interest include the right to assign or sell the interest and, most fundamental, the right to exclude others - most significantly, the government. (*See infra*, ¶ 64-87). Even if AWMS could assign its interest in the lease (a matter on which the lease is silent), it cannot prevent the government from inserting itself at any moment and directing the way in which AWMS conducts its business. At any time, the Division's oversight would supersede any property right AWMS might possess to inject brine.

18

{¶58} Still, for a comprehensive legal analysis, we shall address whether AWMS possesses the requisite property interest. As noted above, the state generally exercises a high degree of control over commercial endeavors. *Am. Pelagic Fishing Co.*, *supra*, at 1377. As such, where personal property is also commercial property, the owner should be on notice of the possibility that a regulation may render that property economically valueless. *Id.* To establish a cognizable property interest in personal, commercial property, therefore, AWMS was required to demonstrate it had a right to use the equipment. *Id.*

{¶59} Prior to the Suspension Order, AWMS was able to enjoy the use of the equipment without the Division's interference. The use of the equipment, which is not inherent in AWMS' ownership, was totally and entirely dependent upon the permit issued by the Division. *See Mitchell Arms II*, *supra*, at 217. Even though AWMS had an expectation that, upon purchasing and erecting the equipment at issue, it would be able to freely use the same for commercial profit, it had no legitimate claim of entitlement to use it. Therefore, we decline to hold AWMS possessed a cognizable property interest in the equipment under the Fifth Amendment.

{¶60} **D. PROPERTY INTEREST IN THE PERMIT**

{¶61} Next, AWMS contends it has a vested property interest in its permit because, in issuing the permit, the Division did not confer a discretionary benefit that could be arbitrarily revoked. AWMS underscores that Ohio statutory law and administrative rules create and ensure that its property interests under the permit are protected. While AWMS' assertions are not without some basis, it appears to be conflating its due process property interests with the property interests necessary to

19

establish a cognizable property interest for a compensable-takings analysis. These two Fifth Amendment property interests are legally distinct.

{¶62} The existence of a property interest in an intangible benefit, such as a permit, may give the holder of the interest a right to a hearing before the benefit is taken away as a matter of procedural due process.[4] *See*, *e.g.*, *Perry v. Sindermann*, 408 U.S. 593, 603, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). This right, however, does not necessarily mean the interest entitles a holder to compensation under the Takings Clause of the Fifth Amendment. *See Pro-Eco, Inc. v. Bd. of Commrs. of Jay Cty.*, 57 F.3d 505, 513 (7th Cir.1995) ("[P]roperty as contemplated by the Takings Clause and property as contemplated by the Due Process Clause cannot be coterminous. * * * The Due Process Clause * * * recognizes a wider range of interests as property than does the Takings Clause"); *Corn v. Lauderdale Lakes*, 95 F.3d 1066, 1075 (11th Cir.1996) ("'Property' as used in the Just Compensation Clause is defined much more narrowly than in the due process clauses"); *Kizas v. Webster*, 707 F.2d 524, 534-540 (D.C.Cir.1983); *Arctic King Fisheries, Inc. v. United States*, 59 Fed.Cl. 360, 372 (Fed.Cl.2004), fn. 27. To wit, "[a] claim of *deprivation* of property without due process cannot be blended as one and the

---

4. It is worth pointing out that, given the manner in which AWMS has pleaded this matter, the substantive component of the Due Process Clause would not apply to this case. There are three forms of regulatory action that generally will be deemed a taking for Fifth Amendment purposes, *see Crown Point Dev., Inc. v. Sun Valley*, 506 F.3d 851, 855 (9th Cir.2007): First, where the government requires an owner to suffer a permanent physical invasion of property, *see Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); second, where a regulation deprives an owner of all economically beneficial use of property, *see Lucas*, *supra*; and third, a partial regulatory taking where the *Penn Central* factors are met. *See Penn Cent. Transp. Co. v. New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). To the extent a property owner's complaint falls within one of these categories (or some other recognized application of the Takings Clause), the Supreme Court of the United States has indicated that the claim must be analyzed under the Fifth Amendment. *Crown Point Dev.* at 855-856, citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). To the extent, however, the conduct alleged cannot be a taking, a substantive due process claim is not precluded. *See Lingle*, *supra*, at 542 ("[A] regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause"). Throughout these proceedings, AWMS has argued the Division's actions have effected either a categorical or a partial regulatory taking. Hence, the substantive aspect of the Due Process Clause is inapplicable.

20

same with the claim that property has been *taken* for public use without just compensation." (Emphasis sic.) Sackman, *Nichols' The Law of Eminent Domain*, Section 4.3.

{¶63} A "legitimate claim of entitlement" to a permit or the benefits of possessing a permit does not transform the permit or the benefits it confers into a vested, cognizable property interest under the Just Compensation Clause. That is, although one who applies for and receives a permit may have such a legitimate claim, that claim is, in Ohio, protected by due process through administrative procedures. As such, due process "property interests" in the permit or its benefits are "limited, as a general rule, by the governmental power to remove, through prescribed procedures, the underlying source of those benefits." *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 798, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) (Blackmun, J., concurring in judgment).

{¶64} While AWMS had/has a legitimate entitlement to due process protections in its possession of the permit (which have been vindicated through the administrative process), we decline to conclude that this entitlement rises to the level of "property" protected by the Takings Clause. If AWMS' right to receive the benefits from the permit was a cognizable property interest under the Takings Clause, the state could not deprive AWMS of the permit's benefits, even after notice and an opportunity to be heard, without affording it just compensation.

{¶65} Such an outcome would be absurd and inconsistent with the heightened regulatory authority the statutory scheme accords the Chief and the Division as well as general, accepted conceptions of the state's police power. *See DeMoise v. Dowell*, 10 Ohio St.3d 92, 96, 461 N.E.2d 1286 (1984) (because nearly every exercise of the state's police power interferes with the enjoyment or possession of property, the constitutional

21

provisions against the taking of property must give way to the exercise of the state's police power if it bears a real and substantial relation to the public health and safety and is neither unreasonable nor arbitrary).

{¶66} With the foregoing in mind, we acknowledge that, over the course of the parties' ongoing interactions from the inception of AWMS' business venture, the acts or omissions of the Division could be seen as a form of bureaucratic stonewalling. While we neither condone nor validate what might reasonably be considered administrative foot-dragging, AWMS received procedural due process via the administrative procedures under Ohio law. The Tenth Appellate District determined the suspension order was reasonable, and its decision was left untouched by the Supreme Court of Ohio.

{¶67} We therefore conclude AWMS' due process rights vested in its possession of the permit do not rise to the level of a cognizable property interest protected by the Takings Clause.

{¶68} With these points in mind, "[c]ourts which have directly considered the question at bar have taken a dim view of the notion that government-issued licenses [or in this matter a permit] are compensable property interests." *Kafka v. Montana Dept. of Fish, Wildlife & Parks*, 348 Mont. 80, 96, 201 P.3d 8 (2008), citing *United States v. Fuller*, 409 U.S. 488, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973) (grazing permit not a compensable property interest); *Conti*, *supra*, at 1342 (commercial fishing permit not a cognizable property interest); *Am. Pelagic Fishing Co.*, *supra*, at 1374 (previously issued fishing permits were revoked, but court found no compensable property interest).

{¶69} In addressing whether AWMS' interest in its permit is entitled to the protection of the Fifth Amendment's Just Compensation Clause, we reiterate the axiom that "'[p]roperty interests * * * are not created by the Constitution. Rather, they are created

22

Case No. 2016-T-0085

and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law * * *.'" *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), quoting *Roth*, *supra*, at 577. These "rules or understandings" focus upon the nature of the citizen's relationship to the alleged property, not the government's. *See Conti* at 1340, citing *Gen. Motors*, *supra*, at 378. To the point, courts have considered specific factors inherent in an alleged "property right" that, when considered in sum, may or may not create a cognizable property interest under the Just Compensation Clause.

{¶70} Specifically, compensable property interests may exist in a governmentally-issued permit if there is no explicit statutory language preventing the formation of such an interest, combined with the right to transfer the interest and the right to exclude others. *See Members of the Peanut Quota Holders Assn., Inc. v. United States*, 421 F.3d 1323, 1331 (Fed.Cir.2005), *cert. denied*, 548 U.S. 904, 126 S.Ct. 2967, 165 L.Ed.2d 951 (2006); *see Kafka* at 96; *Conti* at 1341-1342; *Am. Pelagic Fishing Co.* at 1373-1374.

{¶71} Moreover, "courts must consider whether the affected 'right of use' is dependent upon the regulatory scheme or whether 'an independent or preexisting right of use under common law applies.'" *Page v. United States*, 51 Fed.Cl. 328, 339 (Fed.Cl.2001), quoting *Maritrans Inc. v. United States*, 40 Fed.Cl. 790, 798 (Fed.Cl.1998). If the interest was independent of the regulatory scheme, courts have found that a compensable taking has occurred. *See, e.g., Cienega Gardens*, *supra*, at 1334 (concluding that federal statutes preventing the prepaying of federally subsidized mortgages were a taking of property despite heavy regulation of the federal housing program).

Case No. 2016-T-0085

{¶72} Conversely, courts have determined that property interests that are dependent on a regulatory scheme are not compensable where pervasive regulation exists in the area. *See, e.g., Bowen v. Pub. Agencies Opposed To Social Sec. Entrapment*, 477 U.S. 41, 55-56, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986) (holding there was no vested property interest where an act of Congress eliminated the state's ability to terminate participation in national social security program where Congress retained the right to amend the statutory scheme for the public welfare); *see also Conti* at 1341-1342 (finding no property interest for fisherman where, inter alia, the permit was altered by a new regulation permitted under existing statutory scheme).

{¶73} We shall address each of the relative "sticks" in AWMS' abstract bundle of property rights to determine whether it possesses a cognizable property interest in the permit. It bears noting that when we requested the parties to identify the alleged cognizable property interest at issue (if any), AWMS did not engage in this analysis in its post-trial supplemental brief or direct this court to authority as to why such an analysis might be unnecessary.

{¶74} **i. ABILITY TO TRANSFER**

{¶75} "The right to transfer is a traditional hallmark of property." *Members*, *supra*, at 1332. Here, the "Well Permit" issued to AWMS for the #2 Well, issued on July 18, 2013, expressly states, "This permit is NOT TRANSFERABLE." Pursuant to the unequivocal and bold language of the permit itself, AWMS plainly lacked the ability to transfer its rights and/or privileges under the permit.

{¶76} Moreover, while perhaps less directly, the governing statutory scheme, read in relation to AWMS' lease, demonstrates it was precluded from transferring or assigning its permit to drill and inject. AWMS' lease affords it a right to operate injection wells on

24

the subject property. Specifically, the lease provides, in relevant part: "Lessor hereby grants and leases to Lessee the exclusive right to operate one or more Class II Saltwater disposal wells * * * on the Property * * *. Lessor expressly excepts from this Lease and reserves to Lessor all minerals of every kind and character including but not limited to oil and gas."

{¶77} R.C. 1509.01(A) defines "Well" as "any borehole, whether drilled or bored, within the state for production, extraction, or injection of any gas or liquid mineral, excluding potable water to be used as such, but *including natural or artificial brines and oil field waters*." (Emphasis added.) R.C. 1509.01(K) defines "Owner," in relevant part, as "the person who has the right to drill on a tract or drilling unit, to drill into and produce from a pool, *and* to appropriate *the oil or gas* produced therefrom either for the person or for others, except that a person ceases to be an owner with respect to a well when the well has been plugged in accordance with applicable rules adopted and orders issued under this chapter. 'Owner' does not include a person who obtains a lease of the mineral rights for oil and gas on a parcel of land if the person does not attempt to produce or produce oil or gas from a well or obtain a permit under this chapter for a well * * *." (Emphasis added.)

{¶78} Here, AWMS has two wells as contemplated by R.C. 1509.01(A). AWMS obtained permits for its wells; it does not, however, have a lease for the mineral rights for oil and gas on the leased land. Hence, even as a statutory permit holder and injection well operator, AWMS is not an "owner" under the code – especially because the General Assembly included injection of brine water in its definition of a well but did not include a leaseholder for the right to inject brine in its definition of owner.

25

{¶79} Pursuant to the narrow nature of AWMS' rights under its lease, in conjunction with the interplay of R.C. 1509.01(A) and (K), AWMS is not a statutory "owner." If it is not an owner (because it only possesses the leasehold right to operate disposal wells), regardless of whether it is a permit holder, it cannot transfer or assign that right. Pursuant to R.C. 1509.01(K) and R.C. 1509.31(C), only an "owner" holding a drilling permit for an "oil and gas lease" can transfer or assign that interest.

{¶80} The permit, by its plain language, prevents transferability. Further, AWMS is not a statutory "owner" and accordingly cannot "transfer or assign" its interest under the revised code. We therefore conclude AWMS necessarily lacks the fundamental ability to transfer its property interest in the permit.

{¶81} **ii.  RIGHT TO EXCLUDE**

{¶82} The Supreme Court of the United States has recognized "that the right to exclude is 'perhaps the most fundamental of all property interests.'" *Members*, *supra*, at 1333, quoting *Lingle*, *supra*, at 539. "In the bundle of rights we call property, one of the most valued is the right to sole and exclusive possession—the right to *exclude* strangers, or for that matter friends, but especially the [g]overnment." (Emphasis sic.) *Hendler v. United States*, 952 F.2d 1364, 1374 (Fed.Cir.1991). To provide further definition of the right to exclude as being fundamental to a cognizable property interest, caselaw on the subject is highly instructive.

{¶83} In *Conti*, *supra*, the Federal Circuit was asked to decide whether a fishing permit was a cognizable property interest subject to a takings analysis. *See id*. at 1340. The permit holder was subject to the federal government's prohibition on drift gillnet swordfishing in the Atlantic Swordfish Fishery. *Id*. at 1337. The holder brought a lawsuit alleging that the regulation effected a taking of his permit requiring just compensation. *Id*.

26

The court reasoned that "courts have held that no property rights are created in permits and licenses." *Id.* at 1340. The court emphasized the fact that the holder did not have the right to assign, sell, or otherwise transfer the permit and stated that such rights "are traditional hallmarks of property." *Id.* at 1341. The court also pointed out the holder did not have the right to exclude under the permit. *Id.* The court observed that the fishing permits did not confer exclusive fishing privileges in the oceanic fisheries and that the government retained the right to suspend, revoke, or modify the permit. *Id.* at 1341-1342. Accordingly, the court held the permit holder had no cognizable property right in the permit. *Id.* at 1342.

**{¶84}** In *Mitchell Arms II, supra*, the Federal Circuit declined to recognize a property interest in a contract entered into in accordance with the terms of a firearm import permit issued pursuant to federal law and suspended before the contract could be performed. *See id.* at 215-216. The court determined that when a citizen voluntarily enters a market subject to pervasive governmental control and regulation, he or she does not possess the right to exclude. *Id.* at 216. Put differently, the court concluded that the relevant right to exclude that the permit holder lacked was the ability to exclude others from the market for sale of firearms. *Id.* at 215. Only the government possessed this power. *Id.*

**{¶85}** In *Kafka, supra*, the Supreme Court of Montana considered whether owners of an alternative livestock game farm suffered a compensable taking as a result of an initiative that prohibited the owners from charging a fee to shoot the livestock – a significant source of income which was previously permissible via state licensing. *See id.* at 91. Although the court concluded the licenses were transferrable when issued, it determined the owners did not possess the right to exclude. *Id.* at 99-100. Specifically,

27

Case No. 2016-T-0085

the court noted nothing in the language of the licenses gave the license holders the right to exclude others from the Game-Farm industry. *Id.* at 99. The holders were not assured freedom from competition nor were they guaranteed a discrete segment of the industry. *Id.* at 100. The court also underscored the industry was highly regulated, which militated significantly against the right to exclude because the government exercised control over licensing. *Id.* Although the licenses in *Kafka* were transferable and they were free of any language prohibiting the formation of a compensable property interest, the court concluded the licenses lacked excludability and thus were not a cognizable property interest. *Id.*

{¶86} In *Carney v. Atty. Gen.*, 451 Mass. 803, 890 N.E.2d 121 (2008), the Supreme Judicial Court of Massachusetts determined dog track owners' racing licenses lacked excludability, and thus owners' expectation of continued renewal of licenses was not a property interest. *See id.* at 816-817. The court underscored the licensees lacked the power to prevent other market entrants from obtaining licenses. *Id.* at 817. In so concluding, the court underscored that "the licenses lack the essential attribute of exclusivity." *Id.* at 816.

{¶87} In *Members*, *supra*, the court, in discussing the "right to exclude," stated:

{¶88} "A license represents a limited suspension of the otherwise general restrictions imposed by the government—in the case of a fishing license, it is merely a representation by the government that it will not interfere with the licensee's efforts to catch fish. The number of licenses to be issued under such a scheme is not fixed. Each additional license dilutes the value of the previously issued licenses. So long as the government retains the discretion to determine the total number of licenses issued, the number of market entrants is indeterminate. Such a license is by its very nature not

28

exclusive. Neither the fisherman nor the firearms salesman can exclude later licensees from entering the market, increasing competition, and thereby diminishing the value of his license." *Id.* at 1333-1334.

{¶89} In this matter, AWMS' permit did not give it the right to exclude others from the injection-well industry or confer upon it a discrete segment of the injection industry in Trumbull County. There was nothing to indicate the number of permits in the region of AWMS' wells was limited or that another potential well operator could not obtain a well permit in direct propinquity to AWMS' leasehold property. Further, the Division retained the discretion to determine the total number of permits issued, and, as a result, the number of market participants in any given region is unfixed.

{¶90} Also, there is nothing to indicate that the Division somehow represented or otherwise suggested it would not interfere with AWMS' well operation once its permit was issued. To the contrary, the permit issued by the Division included multiple conditions demonstrating that AWMS could only operate if it met the Division's criteria for operation. Indeed, prior to initiating operations, AWMS was required to receive additional, written approval from the Division to commence injection.

{¶91} We recognize that AWMS does have the right to exclude others from surface injection of brine on the leased property. That is, AWMS entered into the lease with the lessor, and the lease conferred exclusive rights to inject brine (to the extent AWMS received the necessary permits). In this regard, AWMS could, by operation of its leasehold, prevent others from entering its leased property and attempting to commence surface injection. This right, however, is not a function of the permit but is due to the inherent rights conferred by the leasehold itself. Hence, this point is irrelevant to AWMS' legal ability to exclude others as it relates to the property interest that was allegedly taken.

29

Case No. 2016-T-0085

Each of the foregoing points militates strongly against any claim that AWMS possessed the right to exclude.

{¶92} Additionally, in *Chance v. BP Chems., Inc.*, 77 Ohio St.3d 17, 670 N.E.2d 985 (1996), the Supreme Court of Ohio rejected property owners' trespass claim based upon the lateral migration of subsurface waste injectate beneath the property owners' land. The court concluded that without demonstrating some physical damage or interference with the property itself, the claim for relief was without merit. *See id.* at 28.

{¶93} The court determined that "subsurface rights in [the owners'] properties include the right to exclude invasions of the subsurface property that actually interfere with [their] reasonable and foreseeable use of the subsurface." *Id.* at 26. From this, we can extrapolate that AWMS cannot universally exclude wastewater that might migrate from other wells onto its leased property, which is an additional point that weighs significantly against any arguable right to exclude.

{¶94} Finally, similar to the situation in *Mitchell Arms II*, *supra*, AWMS voluntarily entered into an industrial arena that is subject to significant if not complete governmental control. The industry is highly regulated, and a prospective market participant can only inject wastewater if it obtains the necessary permit. "'[E]nforceable rights sufficient to support a taking claim against the [government] cannot arise in an area voluntarily entered into and one which, from the start, is subject to pervasive [g]overnment control.'" *Id.* at 216, quoting *Mitchell Arms I*, *supra*, at 5 (applying *Bowen*, *supra*).

{¶95} Accordingly, an entity does not possess the "right to exclude" in a regulated arena where the government possesses complete control over the manner in which the entity operates its business. AWMS knowingly and voluntarily entered into a market which, by its own recognition, included significant and continuing investment risk and is

30

also highly regulated. Due to such risks and regulation, AWMS knew that operations could be suspended and/or terminated at any time. *See* Confidential Offering Memorandum submitted by AWMS to potential investors in September 2013.

**{¶96}** AWMS pursued its risky investment, aware of the heightened governmental oversight and scrutiny, fully aware it could not "keep out" the government. In this additional regard, AWMS' expectation of continued or consistent operation, which fundamentally and necessarily flowed from its Division-issued permit, cannot meet the excludability condition essential to a cognizable property interest.

**{¶97}** In sum, we conclude that AWMS has failed to establish, and the facts and circumstances demonstrate, it does not possess the right to exclude necessary for establishing a cognizable property interest.

**{¶98}** iii. **<u>TRADITIONAL STATE PROPERTY INTEREST OR COMMON LAW RIGHT</u>**

**{¶99}** Just as in *Mitchell Arms II*, where the court explained the ability to sell a firearm does not inhere in ownership of the firearm itself, the right to inject does not inhere in the ownership of a physical injection well. The right or privilege to inject exists only by virtue of an authorized and valid permit. Moreover, in *Kafka*, the court concluded that "the ability to operate a Game Farm is not a common law right incident to the ownership of real property, and is legal only by virtue of legislative enactment." *Id.* at 99.

**{¶100}** Similarly, Ohio received "primacy" for its Underground Injection Control program from the United States EPA in 1983 and was thus given authority to enforce and administer the program. *See Am. Water Mgt. Servs., LLC*, 2018-Ohio-3028, at ¶ 23. The ability to inject wastewater into the earth is permissible only by virtue of R.C. Chapter 1509. If the requirements of that chapter are not met, an entity could not inject such

31

waste. AWMS' rights under the permit are inextricably dependent on the regulatory scheme enacted by Ohio's General Assembly. In this respect, injection cannot be viewed as a traditional property interest under state law or an otherwise common-law right.

{¶101} Additionally, the Federal Circuit has observed that, when considering whether a cognizable property interest exists, a court "should inquire into the nature of the land owner's estate to determine whether the use interest proscribed by the governmental action was part of the owner's title to begin with, *i.e.*, whether the land use interest was a 'stick in the bundle of property rights' acquired by the owner." *M & J Coal Co. v. United States*, 47 F.3d 1148, 1153-1154 (Fed.Cir.1995), *cert. denied*, 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995), quoting *Lucas*, *supra*, at 1027. As just noted, injecting brine is neither a common law right incident to ownership, and an owner's or leaseholder's ability to do so is fundamentally dependent upon statutory compliance and the Division's oversight. AWMS' "use interest," therefore is not a Fifth Amendment property interest under the Takings Clause.

{¶102} **VI. CONCLUSION**

{¶103} AWMS' lease does not, nor could it, vouchsafe it any assured interest that it could inject brine on any aspect of the property. And, while the lease gives it exclusive rights to operate Class II disposal wells, such a right is conditioned on its ability to obtain necessary permits. Any ability to operate such wells was not inherent in the lease but dependent upon the Division's discretion to issue such permits and subject to heightened governmental oversight. Even if AWMS could transfer or assign its lease, it therefore fundamentally lacked the necessary right to exclude the government. Accordingly, AWMS does not possess a cognizable property interest in the lease that would trigger a Fifth Amendment takings analysis.

32

{¶104} Moreover, while AWMS has a property interest in its wells and equipment, these items were not physically seized by the Division. Rather, their use was merely suspended via an order deemed reasonable and lawful during the administrative process. And, significantly, AWMS' ability to operate its equipment was fundamentally dependent upon the Division's oversight; as such, it had no legitimate entitlement to utilize the same. Any interest AWMS has in this property, therefore, does not require a Fifth Amendment takings analysis.

{¶105} Finally, although there appears to be no *express* statutory language preventing the formation of a property right in AWMS' permit, the lack of transferability, the lack of the right to exclude, coupled with the lack of a common-law right incident to property ownership compel the conclusion that AWMS has no cognizable property interest in its permit. Thus, because the permit does not meet any of the criteria for compensability under governing law, we therefore additionally conclude that AWMS has failed to meet the necessary, preliminary prong of the Fifth Amendment's takings analysis. AWMS' petition for writ of mandamus is accordingly denied.

JOHN J. EKLUND, P.J., THOMAS R. WRIGHT, J., MARY JANE TRAPP, J., concur.

33

Case No. 2016-T-0085